JUSTICE HOOD delivered the Opinion of the Court.
¶ 1 One afternoon several years ago, the petitioner, Nicholas Zapata, and Jose Murillo entered a Littleton convenience store. Murillo darted behind the checkout counter, where he used a knife to attack the clerk, the only other person in the store. Zapata watched the attack from the other side of the counter. Perhaps to everyone's surprise, the victim quickly managed to subdue Murillo with a hammer that happened to be located behind the counter. With that unexpected turn of events, Zapata fled.
¶ 2 The People charged Zapata with attempted first degree murder and other crimes. At trial, the People asserted that Zapata orchestrated the attack. They painted a picture of a jealous and controlling Zapata, seeking revenge on behalf of his ex-girlfriend, S.M. S.M. worked in the convenience store and had confided in Zapata several weeks earlier that her boss, the store owner and father of the victim, had sexually harassed her. The People argued that Zapata convinced Murillo to do his dirty work in seeking revenge, but at the store, they confused the son for his father. The jury convicted Zapata of attempted second degree murder and first degree assault.
¶ 3 Zapata seeks a new trial because the trial court declined to give him access to, or to review in camera, certain competency reports regarding Murillo (who suffered brain damage as a result of the hammer blows). Zapata alleges the reports might contain exculpatory information about the criminal offenses of which he now stands convicted. He also argues that the trial court committed reversible error when it admitted "res gestae" evidence of Zapata's earlier threatening behavior toward S.M.
¶ 4 A division of the court of appeals affirmed Zapata's convictions, concluding as follows: Murillo's competency reports were privileged and no waiver justified disclosure in Zapata's case; Zapata failed to make a particularized showing that the reports contained exculpatory information; and any error in admitting the res gestae evidence was harmless. People v. Zapata , 2016 COA 75M, ¶¶ 22-30, 39, --- P.3d ----.
¶ 5 We hold that Murillo's competency reports are protected by the physician-patient or psychologist-client privilege and Murillo did not waive the privilege as to Zapata when he put his competency in dispute in his own case. We further conclude that Zapata did not make a sufficient showing that the competency reports contained exculpatory evidence *522 to justify their release to him or review by the trial court. Finally, we conclude that any error in the admission of res gestae evidence was harmless given the strong evidence of Zapata's guilt.
¶ 6 Thus, we affirm the judgment of the court of appeals.
I. Facts and Procedural History
¶ 7 Before the assault in question, Zapata and Murillo boarded a light rail train in downtown Denver. Video surveillance footage shows the two stepping off the train seconds apart at the downtown Littleton station and walking side-by-side away from the station. About that time, Zapata texted S.M.: "Don[']t be there." He sent S.M. the same warning twice more in the next thirty minutes. S.M. responded to each message with confusion, asking what and where Zapata was talking about.
¶ 8 A short time after getting off the train, Zapata and Murillo entered Littleton Neighborhood Food and Gas. The victim, the son of the store owner, was there alone, working as a clerk. Murillo headed straight behind the counter and attacked the victim with a steak knife. The victim fought back first by yanking Murillo's shirt over his head, and then by grabbing a hammer from a nearby tool box and using it to repeatedly strike Murillo in the head.
¶ 9 Zapata stayed on the other side of the counter and watched. A videotape of the incident that was admitted into evidence reveals that some variation of the words, "Get him, get him, get him good" were muttered, although at trial, the parties disputed whether Zapata or Murillo said the words. As Murillo groaned, Zapata backed up, turned around, and walked out of the store. The victim eventually subdued his assailant, Murillo, by battering him into unconsciousness with the victim's improvised weapon.
¶ 10 The People charged Zapata and Murillo, separately, with attempted first degree murder and other crimes. The People's theory was that Zapata, upon learning that the store owner had sexually harassed S.M., sought revenge. According to the People's version of events, Zapata and Murillo mistook the victim for his father. Zapata countered that there was no shared plan; rather, "Murillo was a loose cannon," addicted to drugs.
¶ 11 In the proceedings against Murillo, Murillo's counsel questioned his competency to stand trial. The fight had left Murillo with brain damage. Murillo's competency was evaluated twice, once by court order and another time at his own request. The record does not reveal what type of mental health professional examined Murillo. Regardless, Murillo eventually withdrew his claim of incompetency and entered plea negotiations with the prosecution. Murillo agreed to plead guilty to the lesser charge of conspiracy to commit second degree murder; in exchange, he would testify against Zapata.
¶ 12 Zapata sought access to records of any statements regarding the attack made by Murillo during his competency evaluations. Zapata alleged there was potentially exculpatory material in the competency reports, contending that Murillo could have made inconsistent statements to the competency evaluators that would provide impeachment material. Zapata argued the reports must be provided to him pursuant to section 16-8.5-104, C.R.S. (2018) (addressing "[w]aiver of privilege" as to competency evaluations), and Crim. P. 16.
¶ 13 Initially, the trial court ruled that Zapata was entitled to the reports. Murillo's counsel, however, objected on the grounds that the reports were privileged. At a hearing on the matter, the prosecution acknowledged that it had examined at least one of the competency reports during plea negotiations in Murillo's case, noting that there were "maybe two lines about the actual incident in this competency evaluation, and there is nothing in the competency evaluation that is not in the proffer that we've already discovered anyway."
¶ 14 Ultimately, the trial court denied Zapata's request for access to the competency reports, reasoning that they are privileged and the statute outlining who may receive information regarding a defendant's competency evaluation-the judge, defense counsel, and prosecution in the defendant's case-doesn't include a codefendant in a separate *523 case. Zapata's attorney then requested that the court review the material in camera. The court denied that request as well.
¶ 15 The People also sought to introduce evidence that Zapata knew about the alleged sexual harassment of S.M. and evidence from a week before the convenience store incident when Zapata allegedly sent a series of harassing, threatening, and profanity-ridden texts to S.M. The People argued the evidence was res gestae because "[Zapata's] jealousy and desire to resume his relationship with [S.M.], coupled with [the sexual harassment], form a crucial part of the overall narrative of this case," and the evidence regarding how obsessive Zapata was about S.M. was relevant to "why he would choose to take such an extreme action against the store owner." Zapata protested, arguing that S.M. was expected to testify at trial about his connection to the store and that Zapata's actions weeks before the attack bore no relevance to the attack at the convenience store and were unduly prejudicial. The trial court admitted the evidence as res gestae, reasoning that the evidence was necessary to explain "why this particular store, this particular store clerk," and stating that otherwise, "we're starting in the middle of the story."
¶ 16 On the first day of trial, before jury selection, defense counsel objected to any testimony by S.M. regarding physical altercations between S.M. and Zapata that had occurred in the six months before the convenience store attack. The People argued that any such testimony would also be res gestae evidence. The trial court agreed, ruling to allow the testimony.
¶ 17 S.M. testified at trial that she had asked Zapata to help her fill out a complaint with the U.S. Equal Employment Opportunity Commission because of the store owner's alleged harassment. S.M. testified that she told Zapata that the store owner had made sexual overtures and touched her inappropriately. S.M. also testified that Zapata was controlling and wanted to know where she was at all times and that they would physically fight when she talked to other men. She testified that about a week before the attack, Zapata sent her a series of fifty or so text messages threatening her and her family when he learned she was seeing someone else. The threatening and explicit text messages were admitted into evidence at trial.
¶ 18 Murillo testified at trial that he had known Zapata for six months, had no memory of the attack, and had never been to Littleton or seen the victim or the store owner before the attack.
¶ 19 The jury convicted Zapata of attempted second degree murder (a lesser-included offense) and first degree assault, acquitting him of conspiracy to commit murder in the first degree. The court sentenced Zapata to twenty-one years in prison for each count, to run concurrently.
¶ 20 Zapata appealed. In relevant part, he contended that there are two sources of reversible error by the trial court: (1) the failure to provide the competency reports to him, or at least conduct an in camera review of the reports, and (2) the admission of res gestae evidence from the months leading up to the attack showing that Zapata was controlling, obsessive, and physically abusive toward S.M.
¶ 21 A division of the court of appeals affirmed Zapata's conviction. The division held that Murillo's competency reports were protected under the psychologist-client privilege and the privileged material was discoverable only in Murillo's case, not Zapata's. Zapata , ¶¶ 22-29. The court of appeals also concluded that Zapata had not made a "particularized showing that the statements Mr. Murillo allegedly made during the competency evaluations somehow exculpated [the] defendant, or were inconsistent with the information in Mr. Murillo's proffer." Id. at ¶ 30.
¶ 22 Without addressing whether it was error to admit the evidence of res gestae, the division also held that any error was harmless. Id. at ¶ 39. In reaching this conclusion the division reasoned that "the evidence supporting the prosecution's theory was compelling," and the evidence corroborating the defendant's theory was weak. Id. at ¶¶ 40-41.
¶ 23 Zapata petitioned this court for review *524 of the same issues. We granted certiorari.[1]
II. Standard of Review
¶ 24 The issues regarding the competency reports are issues of law, insomuch as they require us to interpret statutes governing privilege in the context of criminal discovery. We review issues of law de novo. People v. Rediger , 2018 CO 32, ¶ 18, 416 P.3d 893, 898 (statutory interpretation); People v. Kailey , 2014 CO 50, ¶ 12, 333 P.3d 89, 93 (interaction of psychologist-patient privilege with other statutes).
¶ 25 We review evidentiary rulings, such as the admission of res gestae evidence, for abuse of discretion. See People v. Stewart, 55 P.3d 107, 122 (Colo. 2002). A trial court abuses its discretion "when its ruling is manifestly arbitrary, unreasonable, or unfair." Id.
III. Analysis
¶ 26 We begin by considering whether Zapata was entitled to examine, or to have the court examine, the competency reports regarding Murillo. We first conclude that competency reports, completed by either a psychiatrist or licensed psychologist per the competency statute, are protected by the physician-patient or psychologist-client privilege. Next, we discuss whether Murillo waived that privilege. Based on the language of the competency statute, we conclude that any statutory waiver was limited and does not extend to Zapata's case. We then address Zapata's constitutional and Crim. P. 16 arguments. After determining that Zapata's confrontation right is not implicated, we examine whether due process or Crim. P. 16 required the disclosure or in camera review of the reports. We conclude that Zapata did not make a sufficient showing that Murillo's reports contained material evidence.
¶ 27 Finally, we consider whether the trial court committed reversible error by admitting evidence of Zapata's controlling and threatening behavior toward S.M. as res gestae evidence. We conclude, after observing that there was strong evidence of Zapata's guilt, that any error in admitting the res gestae evidence was harmless.
A. Competency Reports
¶ 28 First, Zapata asserts that Murillo's competency reports should have been provided to him or reviewed in camera.
1. The Competency Reports Are Privileged
¶ 29 Zapata argues that Murillo's competency reports are not privileged. We disagree. First, we observe that Zapata likely forfeited this argument, abandoned it on appeal, or both. At the motions hearing, Zapata's counsel appeared to assume that the reports were privileged and argued only that the privilege was waived. Likewise, on appeal, Zapata focused his argument on waiver. Regardless, we conclude that competency reports are protected by the psychologist-client or physician-patient privilege.
¶ 30 In addressing these privileges, we must first consider whether a psychologist or physician was involved. Court-ordered and defendant-requested competency evaluations must be conducted by a "competency evaluator." § 16-8.5-101(5), C.R.S. (2018) (defining "[c]ourt-ordered competency evaluation"); § 16-8.5-106, C.R.S. (2018) (allowing a defendant "to be examined by a competency evaluator of his or her own choice"). And "competency evaluator" means a licensed psychologist (with certain qualifications) or a psychiatrist. § 16-8.5-101(2). The record does not include, under seal or otherwise, copies of the reports. Thus, the record does not reveal the identity or professional status of the competency evaluator(s) who conducted the evaluations at issue here. But there is no indication of any failure to comply with section 16-8.5-101(2). Therefore, we assume that *525 either a psychologist or a psychiatrist conducted the evaluations at issue here. We examine the requirements for privilege as to each type of professional.
¶ 31 Communications between a client and licensed psychologist implicate the psychologist-client privilege statute, section 13-90-107(1)(g), C.R.S. (2018). Under this statute, "[a] licensed psychologist ... shall not be examined without the consent of the licensee's ... client as to any communication made by the client to the licensee ... or the licensee's ... advice given in the course of professional employment." § 13-90-107(1)(g). Here, the only portion of the psychologist-client privilege that would be at issue is that which addresses communications made by the client to the licensed psychologist. We acknowledge that the psychologist offers no "advice" (in the clinical sense) to the defendant in this context.
¶ 32 Because psychiatrists are licensed physicians, their communications with patients implicate the physician-patient statute, section 13-90-107(1)(d). Under this statute, "[a] physician ... shall not be examined without the consent of his or her patient as to any information acquired in attending the patient that was necessary to enable him or her to prescribe or act for the patient...." § 13-90-107(1)(d).
¶ 33 Both privileges prohibit both testimonial disclosures and "pretrial discovery of information within the scope of the privilege." Clark v. Dist. Court , 668 P.2d 3, 8 (Colo. 1983). This includes "files or records derived or created in the course of the treatment." People v. Sisneros , 55 P.3d 797, 800 (Colo. 2002) (psychologist-patient privilege).
¶ 34 Because the competency evaluation statute required licensed psychologists or psychiatrists to conduct the competency evaluations at issue here, the reports are privileged if (1) Murillo was a patient or client of the evaluator, (2) the evaluator "attended" to Murillo in conducting the evaluation, and (3) the information acquired in attending to Murillo was necessary to enable the evaluator to act for Murillo. We conclude that all three requirements are met. (We take it as a given that a licensed psychologist would be acting "in the course of professional employment" in evaluating a defendant's competency.)
¶ 35 First, we observe that the question of whether the evaluator "attended to" Murillo in conducting the evaluation is closely connected to the question of whether Murillo was the evaluator's patient or client. Merriam-Webster defines "attend," as relevant here, as "to look after" or "to visit professionally especially as a physician."[2] Attend , Merriam-Webster's Online Dictionary, https://merriam-webster.com/dictionary/attend [https://perma.cc/7L72-R75S]. Physicians certainly "visit" their patients "professionally." Thus, we begin by examining whether Murillo was a patient or client of the evaluator.
¶ 36 The privilege statute does not define "patient" or "client." Black's Law Dictionary simply defines "patient" as "[a] person under medical or psychiatric care." Patient , Black's Law Dictionary (10th ed. 2014). While criminal defendants undergoing competency evaluations typically are not patients or clients in a "fee-for-service" sense, competency evaluations are utilized for diagnostic and treatment purposes. The competency evaluator is, at least in part, performing a role typical of a physician or psychologist in a physician-patient or psychologist-client relationship. In a "[c]ourt-ordered competency evaluation," the examination of the defendant is "directed to developing information relevant to a determination of the defendant's competency to proceed at a particular stage of the criminal proceeding." § 16-8.5-101(5). A defendant is "[c]ompetent to proceed" if he:
do[es] not have a mental disability or developmental disability that prevents [him] from having sufficient present ability to consult with [his] lawyer with a reasonable degree of rational understanding in order to assist in the defense or prevents [him] from having a rational and factual understanding of the criminal proceedings.
§ 16-8.5-101(4). If the defendant is incompetent to proceed, the court has discretion to determine how to restore the defendant to competency. See § 16-8.5-111, C.R.S. (2018).
*526 Any course of action by the court, however, must contemplate using the competency evaluation as a starting point for treatment to restore competency. In sum, the competency evaluator examines the defendant to determine whether the defendant is incompetent and thus needs treatment to address a mental or developmental disability that prevents the defendant from consulting reasonably with his lawyer and understanding the proceedings. Because the competency evaluator is, in part, performing a role typical of a physician-patient or psychologist-client relationship, we conclude that Murillo was a client or patient of the evaluator and the evaluator "attended to" Murillo in conducting the evaluations.
¶ 37 Now we turn to whether the information acquired in attending Murillo was necessary to enable the evaluator to act for him. In general, "before ruling on [a] claim of privilege ..., the trial court [must] determine[ ] whether the particular information ... sought ... [is] in fact necessary for treatment." People v. Reynolds , 195 Colo. 386, 578 P.2d 647, 649 (1978). An evaluator may question the defendant about the offense and its surrounding circumstances-and thus would "acquire that information" in the parlance of the privilege statute-"[t]o aid in forming an opinion as to the competency of the defendant." § 16-8.5-105(3).
¶ 38 And acquiring that information enables the evaluator to act for the defendant. Competency evaluations, even when court ordered, are conducted, at least in substantial part, for the defendant's benefit. The U.S. Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.' " Cooper v. Oklahoma , 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (quoting Medina v. California , 505 U.S. 437, 453, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) ). Thus, these evaluations benefit defendants by protecting their due process rights. Because forming an opinion as to the defendant's competence is done for the defendant's benefit, information utilized in forming such an opinion is necessary for the evaluator to act for the defendant.
¶ 39 Thus, we conclude that competency reports are privileged. While the plain language justifies this conclusion, we further note that the purpose of these privileges is to encourage forthrightness between clients and patients and their psychologists and psychiatrists. See People v. Dist. Court , 719 P.2d 722, 724 (Colo. 1986) (psychologist-client privilege); Cmty. Hosp. Ass'n v. Dist. Court , 194 Colo. 98, 570 P.2d 243, 244 (1977) (physician-patient privilege). Given the weighty due process rights at stake, we surely want to encourage such forthrightness between defendants and the professionals evaluating their competency.
¶ 40 Because competency reports are privileged, they may not be revealed absent Murillo's consent or waiver. Murillo has not consented. Thus, Murillo's competency reports are privileged unless the privilege has been waived. We next address whether the privilege was waived under section 16-8.5-104.[3]
2. The Competency Statute Waives Privilege Only as to the Parties in that Defendant's Case
¶ 41 Zapata argues that Murillo waived the physician-patient or psychologist-client *527 privilege when he put his mental condition at issue by raising competency under section 16-8.5-104. We disagree. The statute waives a defendant's privilege in the competency evaluation only as to the parties and the court in that defendant's case. Thus, Murillo's competency reports remain privileged outside of Murillo's case. And Zapata's case, despite its obvious factual overlap with Murillo's, was outside of Murillo's. Zapata and Murillo were prosecuted separately.
¶ 42 We begin our analysis with the statute, which enumerates the three parties as to whom the privilege is waived. Section 16-8.5-104(1) provides: "When a defendant raises the issue of competency to proceed, ... any claim by the defendant to confidentiality or privilege is deemed waived, and the district attorney, the defense attorney, and the court are granted access , without written consent of the defendant or further order of the court" to information relating to the competency evaluation, including competency evaluation reports. § 16-8.5-104(1) (emphasis added). To the extent the statute could be construed to suggest that there is a general waiver and the enumerated parties are just those who receive the confidential material without a court order, we reject that reading. Four of the five remaining subsections contemplate disclosure only to the same three recipients-defense counsel, the prosecutor, and the court in the defendant's case-reinforcing that the waiver is limited to the parties and the court in that case.[4] Cf. Roberts v. Bruce , 2018 CO 58, ¶ 8, 420 P.3d 284, 286 ("[W]e read the statute as a whole and seek to give consistent, harmonious, and sensible effect to all its parts."). Thus, section 16-8.5-104(1) creates a limited waiver of privilege.
¶ 43 While the statute does not create a general waiver, we consider whether Murillo's actions somehow did. Zapata argues that a defendant who raises competency implicitly waives privilege by placing his mental condition at issue. True, we have said that the test for waiver is "whether the [privilege-holder] has injected her physical or mental condition into the case as the basis of a claim or an affirmative defense." Sisneros , 55 P.3d at 801. Yet, the question isn't whether a defendant waives privilege by raising competency. Of course he does: The statute says so. The question is about the scope of the statutory waiver: Does it extend beyond the parties in the defendant's case? The General Assembly has expressly provided when, how, and to whom a defendant waives his physician-patient or psychologist-client privilege by raising competency. Zapata's theory that raising competency waives privilege entirely would subvert that legislative scheme.
¶ 44 In a similar vein, Zapata argues that exposure of the privileged information to a third party breaks confidentiality and therefore destroys privilege. Specifically, he claims that Murillo waived any privilege by sharing information about his competency evaluations with the prosecution and the court. We have said, at least in other contexts, that exposure to a third party can destroy privilege. See Hartmann v. Nordin , 147 P.3d 43, 52-53 (Colo. 2006) ("Information a person makes available to a third party outside of the physician-patient privilege is not protected by the physician-patient privilege."); Wesp v. Everson , 33 P.3d 191, 198 (Colo. 2001) ("[I]f a communication to which the [attorney-client] privilege has previously attached is subsequently disclosed to a third party, then the protection afforded by the privilege is impliedly waived."). Of course, we have also noted that the scope of "implied waivers [has] always been limited by the circumstances of the case." Alcon v. Spicer , 113 P.3d 735, 739 (Colo. 2005). But where, as here, the General Assembly has specified that only a limited waiver occurs, that-not a general common law principle-controls. See Colo. Const. art. V, § 1 (1) ("The legislative power of the state *528 shall be vested in the general assembly....").[5]
¶ 45 Because we have determined that section 16-8.5-104(1) waives Murillo's physician-patient or psychologist-client privilege in the competency reports only as to the parties in Murillo's case, we conclude that the privilege has not been impliedly waived by exposure to third parties here. Because Zapata is a defendant in an entirely separate criminal case, he is not entitled to the reports.
¶ 46 Finally, we address Zapata's constitutional and Crim. P. 16 arguments. Zapata argues that his confrontation right, due process, and Crim. P. 16 demand that he receive, or at least the trial court review in camera, Murillo's competency reports. We turn to these claims now.
3. The Trial Court's Nondisclosure Does Not Violate the Confrontation Clause, Due Process Clause, or Crim. P. 16
¶ 47 First, we address Zapata's Confrontation Clause argument. We then consider whether the Due Process Clause or Crim. P. 16 compels the trial court to review the reports or provide them to Zapata.
¶ 48 A defendant has a right to confront witnesses against him. U.S. Const. amend. VI ; Colo. Const. art. II, § 19. However, a defendant's confrontation right "is a trial right; it is not a 'constitutionally compelled rule of pretrial discovery.' " People in the Interest of E.G. , 2016 CO 19, ¶ 28, 368 P.3d 946, 953 (quoting People v. Spykstra , 234 P.3d 662, 670 (Colo. 2010) ); accord Pennsylvania v. Ritchie , 480 U.S. 39, 52, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (plurality opinion). Here, Zapata argues the Confrontation Clause required the court to conduct an in camera review of pretrial discovery. In essence, he seeks to bootstrap his trial right to confront his accusers into a pretrial discovery right. Because his trial right to confront witnesses is not at issue, we reject Zapata's confrontation argument.
¶ 49 Zapata's due process argument warrants more discussion. Under Brady v. Maryland , the Due Process Clause requires the government to disclose information that is favorable to the accused and "material either to guilt or to punishment." 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Consequently, impeachment material must be disclosed under Brady . See United States v. Bagley , 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the Brady rule."); Giglio v. United States , 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (holding that the government must disclose evidence affecting a witness's credibility, especially when that witness's testimony is crucial to the government's case). Because Crim. P. 16"codifies Brady 's constitutional disclosure requirement," we evaluate this argument "through the lens of Brady ." People v. Bueno , 2018 CO 4, ¶ 28, 409 P.3d 320, 326.[6]
¶ 50 Here, although Murillo and Zapata were defendants in entirely separate cases, the prosecutor in Zapata's case had access to the competency reports in Murillo's case. Zapata argues that those reports might contain exculpatory information, such as inconsistent statements by Murillo about the assault. Thus, he contends the trial court abused its discretion in declining to either provide him with the privileged reports or review them in camera.
¶ 51 The U.S. Supreme Court considered a similar situation in Pennsylvania v. Ritchie , 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). Ritchie wanted the trial court to review a file from the state child-protection agency about his alleged sexual abuse of his daughter, arguing it might contain exculpatory evidence, including the names of potentially favorable witnesses.
*529 Id. at 43-44, 107 S.Ct. 989. A Pennsylvania statute made records from the agency privileged, but the privilege contained some exceptions, including that the agency must disclose the records to "[a] court of competent jurisdiction pursuant to a court order." Id. Although the prosecutor did not have the records, id. at 44 n.4, 107 S.Ct. 989, Brady applied because the agency was part of the state government, see id. at 57, 107 S.Ct. 989.
¶ 52 The Ritchie Court held that the Due Process Clause required an in camera review of the material:
Given that the Pennsylvania Legislature contemplated some use of [the agency's] records in judicial proceedings, we cannot conclude that the statute prevents all disclosure in criminal prosecutions. In the absence of any apparent state policy to the contrary, we therefore have no reason to believe that relevant information would not be disclosed when a court of competent jurisdiction determines that the information is "material" to the defense of the accused.
Id. at 58, 107 S.Ct. 989.
¶ 53 The defendant, on the other hand, was not entitled to receive the file for his own review. The Ritchie Court held that a defendant does not get to review a privileged file himself for the benefit of the "advocate's eye"; he gets at most the court's in camera review, if there is a legal basis for such review. Id. at 59-61, 107 S.Ct. 989.
¶ 54 Importantly, Ritchie does not hold that trial courts must always review privileged reports in camera pursuant to Brady . The Court expressly noted that a defendant "may not require the trial court to search through the [privileged] file without first establishing a basis for his claim that it contains material evidence." Id. at 58 n.15, 107 S.Ct. 989 (citing United States v. Valenzuela-Bernal , 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) ("He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.")). We have expanded on this point: For a court to review statutorily privileged material, the initial showing must be more than a "vague assertion that the victim may have made statements to her therapist that might possibly differ from the victim's anticipated trial testimony." People v. Dist. Court , 719 P.2d at 726 ; accord People v. Wittrein , 221 P.3d 1076, 1084 n.7 (Colo. 2009) ; see also Dill v. People , 927 P.2d 1315, 1325 (Colo. 1996).
¶ 55 Here, Zapata made only a vague assertion that the statements might include impeachment material. Zapata contends that Murillo "might have possibly" said something in the context of a privileged relationship at odds with the witness's anticipated trial testimony based on other discovery. At a motions hearing, the prosecution provided Zapata a proffer of Murillo's expected testimony, which was that Murillo did not remember the day of the event. The prosecutor represented, "as an officer of the court," that there were "maybe two lines about the actual incident in this competency evaluation, and there is nothing in the competency evaluation that is not in the proffer." Zapata discussed how Murillo had been shown the video of the attack at some point, and speculated that the reports might reveal that watching the videos caused Zapata to add or subtract details about his story. However, Zapata does not indicate what Murillo might have added or subtracted to his story. His speculative contention does not rise to the level of more than the kind of "vague assertion" we have deemed inadequate to mandate disclosure.
¶ 56 Therefore, we conclude that Zapata has not made a sufficient showing that the privileged reports contain material evidence to justify disclosure or in camera review.
B. Res Gestae Evidence
¶ 57 Defense counsel argues the trial court abused its discretion when it admitted "res gestae" evidence regarding threatening, harassing, and physically abusive behavior by Zapata toward S.M. (and people close to S.M.). We conclude that we need not address Zapata's contentions because any error in admitting the evidence was harmless.
1. The Res Gestae Doctrine
¶ 58 We have defined res gestae evidence as uncharged misconduct evidence that is intertwined with the charged conduct:
*530 Res gestae evidence includes evidence of another offense, which is related to the charge on trial, that helps to "provide the fact-finder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred." Generally, res gestae evidence is linked in time and circumstances to the charged crime, it forms an integral and natural part of the crime, or it is necessary to complete the story of the crime for the jury. When evidence is admitted as res gestae evidence, it is not subject to the general rule excluding evidence of prior criminality.
People v. Skufca , 176 P.3d 83, 86 (Colo. 2008) (quoting People v. Quintana , 882 P.2d 1366, 1373 (Colo. 1994) ) (internal citations omitted).
¶ 59 Zapata argues that the evidence regarding his behavior toward S.M. should not have been admitted as res gestae evidence because: (1) the evidence describes events too unconnected to be considered res gestae; (2) it is improper character evidence pursuant to CRE 404(b) ; (3) it is irrelevant pursuant to CRE 401 ; and (4) it is unduly prejudicial pursuant to CRE 403.
¶ 60 However, we need not address these arguments. Even if the trial court erred in admitting uncharged misconduct evidence as res gestae, we conclude any such error was harmless.
2. Any Error in Admitting the Res Gestae Evidence Was Harmless
¶ 61 We review nonconstitutional trial errors that were preserved by objection for harmlessness. Hagos v. People , 2012 CO 63, ¶ 12, 288 P.3d 116, 119. Under this standard, reversal is warranted if the error affects the substantial rights of the parties, meaning "the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.' " Id. (quoting Tevlin v. People , 715 P.2d 338, 342 (Colo. 1986) ); accord Johnson v. Schonlaw , 2018 CO 73, ¶ 11, 426 P.3d 345.
¶ 62 If we can say with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial, the error is harmless. People v. Gaffney , 769 P.2d 1081, 1088 (Colo. 1989). While "[w]e have never reduced the question of a trial error's prejudicial impact to a specific set of factors[,] ... the strength of the properly admitted evidence supporting the guilty verdict is clearly an 'important consideration' in the harmless error analysis." Pernell v. People , 2018 CO 13, ¶ 25, 411 P.3d 669, 673 (quoting Crider v. People , 186 P.3d 39, 43 (Colo. 2008) ); accord Johnson , ¶ 12. Another important consideration "is the specific nature of the error committed and the nature of the prejudice or risk of prejudice associated with it." Crider , 186 P.3d at 43 ; accord Johnson , ¶ 12. Thus, we turn to evaluating the strength of the admissible evidence on which Zapata was convicted, as well as the nature of the risk of prejudice associated with the potentially impermissible admission of evidence.
¶ 63 Zapata was convicted on a complicity theory. Under this theory, a defendant is legally accountable as a principal for the criminal act of another if "he aids, abets, advises, or encourages the other person in planning or committing that offense" with:
(1) the intent to aid, abet, advise, or encourage the other person in his criminal act or conduct, and (2) an awareness of circumstances attending the act or conduct he seeks to further, including a required mental state, if any, that are necessary for commission of the offense in question.
People v. Childress , 2015 CO 65M, ¶ 34, 363 P.3d 155, 165 ; see § 18-1-603, C.R.S. (2018). "With regard to causing a particular result that is an element of the offense in question, ... complicitor liability as defined by statute in Colorado mandates that the complicitor act with an awareness the principal is or would be acting with that required mental state." Childress , ¶ 29, 363 P.3d at 164. "[C]ircumstances attending the act or conduct," refer to "those elements of the offense describing the prohibited act itself and the circumstances surrounding its commission, including a required mental state, if any." Id.
*531 ¶ 64 The jury convicted Zapata of attempted second degree murder and first degree assault. The requisite culpable mental state for second degree murder is knowingly. § 18-3-103(1), C.R.S (2018). Attempt liability also requires that the defendant, acting with the kind of culpability otherwise required for commission of an offense, engage in conduct constituting a substantial step toward the commission of the offense. A substantial step is any conduct that is strongly corroborative of the firmness of the actor's purpose to complete the offense. § 18-2-101, C.R.S. (2018). First degree assault, as charged here, requires that a defendant act with the specific intent to cause serious bodily injury by means of a deadly weapon. § 18-3-202(1)(a), C.R.S. (2018).
¶ 65 Thus, in order for Zapata to be guilty of the crimes for which he was convicted, there needed to be evidence beyond a reasonable doubt that he intended to facilitate Murillo in his criminal act or conduct, and that Zapata did so with an awareness of the actual circumstances, namely an effort to kill the victim, and the specific intent to cause him, at the very least, serious bodily injury by means of a deadly weapon.
¶ 66 The record reveals strong evidence of Zapata's complicity in the offenses of which the jury found him guilty. According to Zapata, he was merely present when Murillo, a "loose cannon," committed the attack. However, significant evidence supports the notion that Zapata enlisted the aid of Murillo: the photos of Zapata and Murillo entering and leaving the light rail together; Zapata's numerous texts warning S.M., "Don[']t be there"; Zapata's calm demeanor in the video while he watched the attack; even Murillo's testimony that he had never been to the store before-or to Littleton for that matter-and that he had never seen the victim or store owner before the attack. And there's no evidence suggesting another motive for Murillo to go to the Littleton store or to commit the attack. In contrast, even without the res gestae evidence, the testimony by S.M. that she told Zapata about the unwanted sexual attention from the store owner provided a very strong motive for Zapata to convince Murillo to attack the store owner. That Murillo did so with a steak knife right in front of Zapata without any protest from Zapata (coupled with the "get him good" incitement that would more logically come from the viewer rather than the assailant) provides even more evidence of the requisite culpable mental states.
¶ 67 Turning to the nature of the res gestae evidence and its risk for prejudice, we acknowledge that some of the admitted, uncharged misconduct evidence was inflammatory. However, given the strength of the other evidence against Zapata and the implausibility of the defendant's "innocent bystander" theory of the case, we do not believe the uncharged misconduct evidence was so prejudicial as to substantially influence the verdict or impair the fairness of the trial. Because there was strong evidence of Zapata's guilt and an implausible counterargument to that evidence, the res gestae evidence was not so prejudicial as to substantially influence the verdict or impair the fairness of the trial. Thus, we conclude any error as to the admission of res gestae evidence was harmless. See Pernell , ¶ 25, 411 P.3d at 673 ; Crider , 186 P.3d at 43.
IV. Conclusion
¶ 68 We hold that Murillo's competency reports are protected by the physician-patient or psychologist-client privilege and Murillo did not waive the privilege as to Zapata when he put his competency in dispute in his own case. We further conclude that Zapata did not make a sufficient showing that the competency reports contained exculpatory evidence to justify their release to him or review by the trial court. Finally, we conclude that any error in the admission of res gestae evidence was harmless given the strong evidence of Zapata's guilt.
¶ 69 Thus, we affirm the judgment of the court of appeals.
JUSTICE HART specially concurs, and JUSTICE GABRIEL joins in the special concurrence.
JUSTICE SAMOUR dissents, and CHIEF JUSTICE COATS joins in the dissent.

We granted certiorari to review the following issues:
1. Whether the court of appeals erred in not finding that the trial court should have either disclosed or reviewed, in camera, the co-defendant's statements about the crime.
2. Whether the court of appeals erred in not finding that the admission of irrelevant and prejudicial evidence of the defendant's character and other bad acts was reversible.

Black's Law Dictionary does not define "attend."

We acknowledge that our conclusion that competency reports are privileged may have implications for the use of such information in other contexts, such as a competency hearing or trial. Under section 16-8.5-108, evidence acquired during a competency evaluation is admissible in certain circumstances during that defendant's competency hearing, trial, and sentencing. While one could argue this statute seeks to safeguard a defendant's Fifth Amendment rights, see § 16-8.5-104(6) ("Statements made by the defendant in the course of any evaluation shall be protected as provided in section 16-8.5-108."), cf. Lewis v. Thulemeyer , 189 Colo. 139, 538 P.2d 441, 442 (1975) (concluding that the legislative scheme governing sanity evaluations "carefully avoided the constitutional proscriptions against self-incrimination"), the plain language addresses general admissibility of evidence acquired during a competency evaluation. A defendant may also waive his psychologist-client or physician-patient privilege through a course of conduct that impliedly concedes the necessity of revealing otherwise confidential information to third parties during the course of a presumptively public proceeding. Cf. Gadeco, L.L.C. v. Grynberg , 2018 CO 22, ¶ 2, 415 P.3d 323, 326 (reviewing ways in which a patient can impliedly waive his physician-patient privilege).

§ 16-8.5-104(2) ("Upon a request by either party ... the evaluator ... shall provide the information...." (emphasis added)); § 16-8.5-104(3) ("An evaluator ... is authorized to provide ... procedural information to the court, district attorney, or defense counsel ...." (emphasis added)); § 16-8.5-104(4) ("Nothing in this section limits the court's ability to order that information ... be provided to the evaluator, or to either party to the case ...." (emphasis added)); § 16-8.5-104(5) ("The court shall order both the prosecutor and the defendant or the defendant's counsel to exchange the names ... of each physician or psychologist who has examined or treated the defendant for competency." (emphasis added)).

We do not foreclose the possibility that there may be an implied waiver of privilege related to a competency report on other facts.

To the extent that Zapata's Crim. P. 16 argument is not a constitutional one, we refer back to our observation that the physician-patient and psychologist-client privileges prohibit both testimonial disclosures and the pretrial discovery of privileged information. See Sisneros , 55 P.3d at 800 ("Once the privilege has attached, the Defendant may not compel discovery unless it is waived."); Clark v. Dist. Court , 668 P.2d at 8.