The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
October 8, 2020

## 2020COA141

## No. 17CA1583, *Peo v Martinez* — Evidence — Admissibility — Victim Impact Evidence — Irrelevant Evidence Inadmissible

A division of the court of appeals considers whether victim
impact evidence is admissible during the guilt/innocence phase of a
sexual assault trial. The division holds that the trial court erred by
admitting victim impact evidence because the evidence did not
make any material fact or element of the offense more or less
probable and was thus inadmissible. Even though the trial court
erred by admitting the victim impact evidence, however, under the
circumstances of this case, the division concludes that the
admission of the evidence was harmless.

COLORADO COURT OF APPEALS     **2020COA141**

Court of Appeals No. 17CA1583
City and County of Denver District Court No. 16CR710
Honorable Shelley I. Gilman, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Joseph Samuel Martinez,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE LIPINSKY
Navarro and Tow, JJ., concur

Announced October 8, 2020

Philip J. Weiser, Attorney General, Jacob R. Lofgren, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kamela Maktabi, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Victim impact testimony packs a punch at a criminal trial. Trial courts may understandably be inclined to give the victim and the victim's family the catharsis of describing the effect on them of the crime with which the defendant is charged. But the admissibility of such evidence can deprive the defendant of the right to be judged based on the jury's rational deliberation, rather than on jurors' visceral reaction upon hearing how the defendant's alleged acts affected the victim. "A fair and impartial jury is a key element of a defendant's constitutional right to a fair trial under both the United States and Colorado Constitutions." *People v. Abu-Nantambu-El*, 2019 CO 106, ¶ 14, 454 P.3d 1044, 1047 (citations omitted).

¶ 2     Today we decide that a trial court erred by allowing a jury to hear victim impact evidence — "that evidence relating to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family," *Smith v. State*, 119 P.3d 411, 416 (Wyo. 2005) — during the guilt/innocence portion of a sexual assault trial. The evidence had the potential to shift the jury's focus improperly from deciding whether the defendant, Joseph Samuel Martinez, committed the crime to

whether a guilty verdict would assuage the trauma of A.R., the victim.

¶ 3     Under the circumstances of this case, however, the admission of the victim impact evidence constituted harmless error. The guilty verdict rested on the jury's implicit but necessary finding that Martinez lacked credibility in claiming that A.R. had consented to engage in sex with him. Thus, the admission of the victim impact evidence did not affect Martinez's substantial rights and there is no reasonable probability that it contributed to his conviction.

¶ 4     We reject Martinez's other arguments and affirm his judgment of conviction entered on the jury verdict finding him guilty of sexual assault on a victim incapable of appraising the nature of her conduct.

## I.     Background Facts and Procedural History

### A.     The Incident

¶ 5     The trial in this case rested on a single factual dispute — whether Martinez had known that A.R. was too intoxicated to consent to sex. Every other material fact was undisputed.

¶ 6     A.R. recalled consuming three drinks in three hours at a Denver bar. Her last memory of the evening was checking her

phone and using the restroom at the bar at around 9:00 p.m. A.R.'s bank records reflected that she continued to make purchases at the bar, in addition to the three drinks, as the evening wore on.

¶ 7     A.R. next remembered lying on the ground at a Regional Transportation District (RTD) light-rail station. She recalled that an RTD officer helped her board a train and that she felt "very confused, very disoriented," and "[v]ery, very drunk." While on the train, A.R. noticed that her sweatshirt was inside out and that she was missing her identification card, bus pass, debit card, lunch bag, and items she had purchased before visiting the bar. She later discovered that her marijuana pipe and marijuana were also missing. A.R. did not remember much about the initial train ride or that she had transferred trains.

¶ 8     A.R. arrived at the light-rail station nearest her home shortly before 2:00 a.m. She remembered borrowing a stranger's cell phone to call a cab. A.R. recalled that the cab driver was "nice," but did not remember the specifics of their conversation. When she reached her home, A.R. awakened her mother to ask for money to pay the cab driver. Because A.R. was "stumbling" and "slurring her

words," A.R.'s mother said she believed A.R. was "completely drunk."

¶ 9     The next day, after experiencing painful bowel movements and seeing blood in the toilet, A.R. told her mother that she "th[ought] something bad happened." A.R. and her mother went to the hospital, where A.R. underwent a sexual assault examination. A nurse collected DNA, blood, and urine samples from A.R. The examination revealed that A.R. had a small but "significant" rectal tear, a small abrasion to her knee, and a sore thumb. The DNA obtained during A.R.'s examination matched that of Martinez. A DNA test of Martinez's saliva confirmed the match.

¶ 10    When a detective notified A.R. of the DNA match and showed A.R. a picture of Martinez, A.R. said she did not recognize him. Based on this information, the prosecution charged Martinez with one count of sexual assault on a victim incapable of appraising the nature of her conduct, pursuant to section 18-3-402(1)(b), C.R.S. 2019.

## B.    Martinez's Trial

¶ 11    At Martinez's trial, A.R. and her mother testified about the impact of the alleged sexual assault on A.R., including that,

following the incident, A.R. exhibited signs of depression and had a "close suicidal scare." Martinez's counsel objected to the relevancy of this testimony and, after the district court overruled his objection, moved for a mistrial. The court denied Martinez's motion, but permitted him to cross-examine A.R. and her mother on issues related to A.R.'s mental health. Martinez's counsel pursued this line of cross-examination.

¶ 12    In addition to discussing the impact of the alleged sexual assault, A.R. testified that her light-rail commute from downtown Denver typically took an average of between an hour and an hour-and-a-half. On the night of the incident, however, it took A.R. three hours and eleven minutes to return home from downtown Denver.

¶ 13    The detective who investigated the alleged sexual assault testified next. Although the prosecutor had neither designated him nor qualified him as an expert witness, the detective testified that A.R.'s injuries and demeanor during their interview were consistent with the types of injuries and demeanor he had seen in other victims of sexual assault.

¶ 14    An expert witness in the fields of "forensic toxicology" and "the effect of alcohol and controlled substances on the human body" (the toxicology expert) also testified for the prosecution.  Based on the level of alcohol in A.R.'s urine sample taken during her sexual assault examination and the average alcohol elimination rate for a female with A.R.'s weight, the toxicology expert opined that A.R.'s peak blood alcohol concentration on the night of the incident had been between 0.3 and 0.4 percent.  The expert said that A.R. would have had to consume between nine and eleven drinks over a two-and-a-half-hour period to reach that level of intoxication.

¶ 15    The expert further opined that a person who has consumed that amount of alcohol can "blackout," meaning that he or she is conscious but is not forming memories.  The expert testified that she would expect to see outward signs of impairment from a person in a blackout state.

¶ 16    Finally, the prosecutor introduced into evidence video-recordings from several RTD light-rail stations on the night of the incident.  The videos showed A.R. stumbling, falling while crossing light-rail tracks, sleeping on station benches and platforms, missing trains, and getting on a wrong train.

¶ 17    Martinez's defense rested on his contention that he and A.R. had engaged in consensual sex. He said that A.R. approached him and a group of friends and asked one of his friends whether he wanted to have sex with her. According to Martinez, after his friend rejected A.R.'s advances, A.R. handed out marijuana to Martinez and his friends and then had sex with him. He testified that he spent between forty and fifty-five minutes conversing with A.R. before they had sex. He said that A.R. "looked fine," "was coherent," "was walking fine," and that nothing about her appearance made him believe that she was too drunk to know what she was doing.

¶ 18    The cab driver who drove A.R. home from the light-rail station testified that, while A.R. would "maybe fail a breathalyzer," "she was functioning just fine," did not have any issues entering or exiting the cab, did not have any problems communicating her address, did not "pass out," and did not vomit.

¶ 19    An expert in "forensic psychology related to alcohol, blackouts, and memory impairment" (the psychology expert) also testified for Martinez. The psychology expert opined that people can engage in complex activities during blackouts and that blackouts can, but do

not always, cause "substantial impairments due to the alcohol." The expert further explained that people who experience blackouts often try to fill in the gaps in their memory by creating false memories that align with their assumptions and expectations of themselves.

¶ 20     During closing argument, the prosecutor did not mention the impact of the alleged sexual assault on A.R. Rather, the prosecutor focused on two points. First, she argued that Martinez had tailored his testimony about A.R.'s missing marijuana to fit the evidence he had heard while attending the trial. Second, she asserted that, regardless of the competing expert testimony and A.R.'s lack of memory of the incident, the video-recordings from the light-rail stations conclusively proved that, on the night of the incident, A.R. exhibited outward signs of impairment that showed her incapacity to appraise the nature of her conduct.

¶ 21     The jury found Martinez guilty of sexual assault on a victim incapable of appraising the nature of her conduct. The district court sentenced Martinez to an indeterminate sentence pursuant to the Colorado Sex Offender Lifetime Supervision Act of 1998 (SOLSA). §§ 18-1.3-1001 to -1012, C.R.S. 2019.

## II.  Analysis

¶ 22    Martinez presents four principal arguments on appeal.  He contends that the district court erred by

(1)     admitting irrelevant and highly prejudicial victim impact evidence regarding A.R.'s depression and close suicidal scare, and failing to grant his motion for a mistrial after the jury heard the evidence;

(2)     allowing the prosecutor to present a generic tailoring argument during closing argument;

(3)     admitting opinion testimony from the detective even though he had neither been designated nor qualified as an expert witness; and

(4)     providing a revised theory of defense instruction over the objection of Martinez's counsel.

¶ 23    Martinez further asserts that, even if these errors do not independently require reversal, their cumulative effect requires it. Finally, Martinez advances a facial challenge to the constitutionality of SOLSA.

9

## A. Victim Impact Evidence

¶ 24　We agree with Martinez's contention that the district court erred by admitting evidence regarding A.R.'s depression and "close suicidal scare" following the incident. However, we find that the error was harmless and, thus, the court did not abuse its discretion in denying Martinez's motion for a mistrial.

### 1. Standard of Review

¶ 25　We review for an abuse of discretion a trial court's evidentiary rulings, *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002), as well as its denial of a motion for mistrial, *People v. Santana*, 255 P.3d 1126, 1130 (Colo. 2011). "A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law." *People v. Williams*, 2019 COA 32, ¶ 21, 446 P.3d 944, 950.

### 2. The Nonconstitutional Harmless Error Standard Applies

¶ 26　The parties disagree on the appropriate standard for our review of the district court's admission of the victim impact evidence. Martinez contends that the constitutional harmless error standard applies because the admission of the evidence violated his rights to due process and a fair trial. In contrast, the People assert

that we review for nonconstitutional harmless error because any error was evidentiary and not of a constitutional magnitude.

¶ 27     We agree with the People and hold that the nonconstitutional harmless error standard applies to the district court's evidentiary rulings. *Pernell v. People*, 2018 CO 13, ¶ 22, 411 P.3d 669, 673; *see State v. Maske*, 591 S.E.2d 521, 528 (N.C. 2004) (reviewing the admission of victim impact evidence for nonconstitutional harmless error); *Justice v. State*, 775 P.2d 1002, 1011 (Wyo. 1989) (same); *see also People v. Flockhart*, 2013 CO 42, ¶ 20, 304 P.3d 227, 233 ("Only those errors 'that specifically and directly offend a defendant's constitutional rights are "constitutional" in nature.'" (quoting *Wend v. People*, 235 P.3d 1089, 1097 (Colo. 2010))).

¶ 28     Under the nonconstitutional harmless error standard, "reversal is warranted if the error affects the substantial rights of the parties, meaning 'the error substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Zapata v. People*, 2018 CO 82, ¶ 61, 428 P.3d 517, 530 (quoting *Hagos v. People*, 2012 CO 63, ¶ 12, 288 P.3d 116, 119).  Thus, "[i]f we can say with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of

the trial, the error is harmless." *Id.* at ¶ 62, 428 P.3d at 530; *see*

*Pernell*, ¶ 22, 411 P.3d at 673 ("[A]n objected-to trial error is

harmless if there is no reasonable possibility that it contributed to

the defendant's conviction.").

### 3. Legal Authority

¶ 29    Victim impact evidence is evidence that relates to "the victim's

personal characteristics and to the physical, emotional, or social

impact of a crime on its victim and the victim's family."

*Schreibvogel v. State*, 228 P.3d 874, 883 (Wyo. 2010) (quoting *Smith*

*v. State*, 119 P.3d 411, 416 (Wyo. 2005)); *see State v. Graham*, 650

S.E.2d 639, 645 (N.C. Ct. App. 2007) (explaining that victim impact

evidence includes the physical, psychological, emotional, and

economic toll a crime takes on the victim and the victim's family).

¶ 30    The United States Supreme Court decided more than three

decades ago that victim impact evidence is inadmissible because it

may be "wholly unrelated to the blameworthiness of a particular

defendant" and "could divert the jury's attention away from the

defendant's background and record, and the circumstances of the

crime." *Booth v. Maryland*, 482 U.S. 496, 504, 505 (1987),

*overruled by Payne v. Tennessee*, 501 U.S. 808 (1991).

12

¶ 31    But after a change in the composition of the Court, it reversed

course and held that, during the sentencing phase of a death

penalty trial, a prosecutor may present evidence of the impact of the

murder. *Payne*, 501 U.S. at 825 (holding that victim impact

evidence is admissible to remind the jury that "the victim is an

individual whose death represents a unique loss to society and in

particular to his family" (quoting *Booth*, 482 U.S. at 517) (White, J.,

dissenting)).  The Colorado Supreme Court has cited *Payne*

approvingly. *See People v. Dunlap*, 975 P.2d 723, 744 n.14 (Colo.

1999) (holding that "evidence about the victim and about the impact

of the murder on the victim's family is relevant to the jury's decision

as to whether or not the death penalty should be imposed" (quoting

*Payne*, 501 U.S. at 827)).

¶ 32    No Colorado case has addressed the admissibility of victim

impact evidence during the guilt/innocence phase of a criminal

trial.  But we need not decide today whether victim impact evidence

is ever admissible during the guilt/innocence phase of a criminal

case because we hold that, in this case, the victim impact evidence

was irrelevant and, thus, inadmissible.

¶ 33    Because "the effect of a crime on a [victim or the] victim's family often has no tendency to prove whether a particular defendant committed a particular criminal act against a particular victim," such evidence is generally irrelevant during the guilt/innocence phase of a trial. *Graham*, 650 S.E.2d at 645. Thus, the admissibility of victim impact evidence during the guilt/innocence phase of a trial turns on whether the evidence is relevant to determining whether the defendant committed the crime for which he or she was charged. *See id.*; *Schreibvogel*, 228 P.3d at 883; *see also* CRE 402 (irrelevant evidence is inadmissible); *People v. Clark*, 2015 COA 44, ¶ 17, 370 P.3d 197, 204 ("In criminal cases, evidence is relevant if the evidence makes it more or less probable that a criminal act occurred, the defendant was the perpetrator, or the defendant acted with the necessary criminal intent.").

¶ 34    Thus, victim impact evidence is admissible only if it "tends to show the context or circumstances of the crime itself." *Graham*, 650 S.E.2d at 646. In *Graham*, a first degree burglary and assault case, the appellate court considered whether the trial court had erred in admitting, during the guilt/innocence phase of the trial, evidence of the impact of the crimes on the mental health of the

14

victim's mother.  The *Graham* court concluded that admission of the evidence was error, albeit harmless error, because the evidence did not "have any tendency to prove that defendant was the intruder . . . ."  *Id.* at 646-47.

### 4. The District Court Erred by Admitting the Victim Impact Evidence

¶ 35    After the prosecutor asked A.R. "how things have been different for you since the night of the [sexual assault]," A.R. testified,

> Immediately following, I missed out on a lot of work.  I loved my job, but I ended up — there were mornings where I couldn't get out of bed. I couldn't move.  I was in physical pain.
>
> I ended up no-calling/no-showing to my job three times in a row, so I was fired.  My boss sent a police officer to my house because she was afraid I had killed myself.
>
> I spent the next six months just circling the drain for a long time.  It wasn't that I wanted to kill myself; it was that I just wanted to turn off.  I wished there was a switch where I didn't have to feel or think or be conscious.
>
> I had class two days a week, and school's kind of always been my safe place, a place where I really excel.  The other five days a week I spent either sleeping too much, not sleeping at all, eating too much, not eating at all.  I was very, very, very depressed, to say the least.

15

That following March . . . I did have a close
suicidal scare.

¶ 36    The prosecutor elicited similar testimony from A.R.'s mother:

[PROSECUTOR:]  Now, I want to talk to you a
little bit about [A.R.'s] behavior after the
assault.  Did you notice anything different
after the assault about her behavior?

[MOTHER:]  She hibernated afterwards.  She
went into her room and didn't come out for an
extended period of time.  She would come out,
go right back.

[PROSECUTOR:]  Was this different than how
she behaved before?

[MOTHER:]  Yes.

[PROSECUTOR:]  Did you notice any signs of
depression?

[MOTHER:]  Yeah.  She quit going to work.
She quit hanging out with friends, taking her
dog on a walk.  She just — she just closed
herself into the basement bedroom and
bathroom and made herself have a very small
world.

¶ 37    Martinez contends that this testimony was irrelevant because

it had no tendency to prove the contested issue at trial: whether he

"[knew] that [A.R. was] incapable of appraising the nature of [her]

conduct."  § 18-3-402(1)(b).  Moreover, according to Martinez, the

16

evidence was highly prejudicial because it came from two witnesses and likely elicited the jury's sympathy for A.R.

¶ 38    In response, the People assert that the testimony did not constitute victim impact evidence and, in any event, was relevant because it showed "A.R.'s behaviors in the aftermath of her rape to show her lack of recall of the events that occurred on the night of the rape to counter [Martinez's] claim that A.R. was cognizant of her actions and consented to sex with him." Thus, according to the People, A.R.'s and her mother's testimony was necessary "to show that A.R. was so heavily intoxicated that she was incapable of apprising the nature of her conduct, and, thus, she could not and did not consent to have sex with [Martinez]."

¶ 39    As an initial matter, we hold that the testimony constituted victim impact evidence because it described the "physical [and] emotional" toll that the alleged sexual assault took on A.R. *See Schreibvogel*, 228 P.3d at 883 (quoting *Smith*, 119 P.3d at 416).

¶ 40    We agree with Martinez that A.R.'s and her mother's testimony was irrelevant. The prosecutor did not establish at trial how A.R.'s depression and "close suicidal scare" following the sexual assault were relevant to any material fact. Specifically, the prosecutor did

not show that the victim impact evidence made any material fact or element of the offense more or less probable. For example, the evidence did not shed light on why the victim could not remember anything between 9:00 p.m., when she was still at the bar, and when she found herself lying on the ground at a light-rail station hours later. And it did not tend to prove that Martinez possessed or lacked the criminal intent to be found guilty of sexual assault. *See* § 18-3-402(1)(b); *see also Justice*, 775 P.2d at 1010 ("[The victims'] discussion of the impact of the crime upon them could not in any way serve to establish any of the elements of the crime . . . .").

¶ 41    For these reasons, the district court erred by admitting A.R.'s victim impact evidence.

5.    The District Court's Error in Admitting the Victim Impact Evidence Was Harmless

¶ 42    Although the district court erred in admitting the victim impact evidence, we hold that the error was harmless because, "in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial." *Zapata*, ¶ 62, 428 P.3d at 530.

18

¶ 43    The victim impact evidence constituted a minor portion of Martinez's trial.  *See People v. Whitman*, 205 P.3d 371, 385 (Colo. App. 2007).  The prosecutor asked A.R. and her mother a total of four questions regarding A.R.'s behavior following the sexual assault.  This questioning constituted, at most, a few minutes of Martinez's three-day trial.  Moreover, the prosecutor did not refer to or repeat this testimony at any other point of the trial, including during her opening statement and closing argument.  Thus, the prosecutor did not unduly highlight the victim impact evidence or direct the jury to convict Martinez because of it.

¶ 44    The district court also blunted the prejudicial force of the victim impact evidence by permitting Martinez's counsel to inquire into A.R.'s mental health history on cross-examination.  In doing so, Martinez's counsel established that A.R. had a history of depression and alcohol use, thereby showing that her "close suicidal scare" could have been caused by factors other than the alleged sexual assault.  Further, absent evidence to the contrary, we assume the jury heeded the court's instruction not to be influenced by sympathy, bias, or prejudice in reaching its decision.  *See People v. Villa*, 240 P.3d 343, 352 (Colo. App. 2009).

¶ 45    Most significantly, the evidence of Martinez's guilt was overwhelming.  The prosecutor's closing argument focused on Martinez's lack of credibility and A.R.'s obvious impairment in the video-recordings from the light-rail stations.  Indeed, after discussing the video-recordings, the prosecutor stated,

> There's nothing vague or speculative or imaginary about what you just saw.  It is real. And we could have gone through this trial and never presented [the toxicology expert] to you, and you would have had enough evidence just based on this video about [A.R.'s] level of intoxication at the time that she encountered [Martinez] and about her ability to consent.

¶ 46    Thus, contrary to Martinez's characterization of the evidence, this was not a he said/she said case that rested solely on two individuals' conflicting accounts.  While Martinez's counsel challenged A.R.'s credibility, the prosecutor's case did not rest on whether the jury thought A.R. was believable.  A.R. said she could not recall her encounter with Martinez.

¶ 47    Rather, the prosecutor's key evidence was the video-recordings showing A.R. at the various light-rail stations following the incident. Even setting aside the evidence of A.R.'s blood alcohol level at the time of the incident, the video-recordings provided objective

20

evidence that could not be squared with Martinez's testimony that nothing about A.R. had caused him to believe she was too intoxicated to consent to sex.

¶ 48    The video-recordings establish that A.R. was highly intoxicated while at the light-rail stations.  The videos depict an individual who could not walk without stumbling, dropped to the ground for approximately four minutes before pulling herself onto a bench, tumbled while crossing light-rail tracks, fell asleep at two light-rail stations — once on a bench and once while propped up against a signpost, missed trains she needed to take to return home, and had to be awakened by an RTD officer so she could board one of the last trains leaving the station for the night.  This evidence directly bore on Martinez's credibility because it allowed the jury to infer that A.R. was highly intoxicated — and exhibited outward signs of impairment — during her encounter with Martinez.  *See People v. Bertrand*, 2014 COA 142, ¶ 9, 342 P.3d 582, 584 ("The law makes no distinction between direct and circumstantial evidence.").

¶ 49    In sum, although the district court erred by admitting A.R.'s victim impact evidence, the error was harmless in light of the overwhelming evidence of Martinez's guilt.  "[T]here is no reasonable

possibility that [the victim impact evidence] contributed to [his] conviction." *Pernell*, ¶ 22, 411 P.3d at 673.

¶ 50    And because Martinez has failed to show that he was substantially prejudiced by the admission of the victim impact evidence, the district court did not abuse its discretion in denying his motion for a mistrial. *See People v. Ned*, 923 P.2d 271, 275 (Colo. App. 1996) (holding that a defendant must show actual prejudice to warrant reversal of a trial court's denial of a motion for mistrial).

B.    The Prosecutor's Comments on Martinez's Credibility

¶ 51    Martinez asserts that reversal is required because the district court permitted the prosecutor to present a generic tailoring argument during closing, which "create[d] an unjustifiable inference of guilt" based solely upon Martinez's presence at trial. We disagree.

1.    Standard of Review

¶ 52    We review claims of prosecutorial misconduct under a two-step analysis. *Wend*, 235 P.3d at 1096. "First, [we] must determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances and, second,

whether such actions warrant reversal according to the proper standard of review." *Id.*

### 2. Preservation

¶ 53    The parties disagree whether Martinez preserved this issue for appeal.  Martinez contends that he preserved the issue through his counsel's objection that the prosecutor had engaged in burden-shifting, thereby "alert[ing] the trial court to the potential impropriety of the prosecutor's closing argument."  *Martinez v. People*, 244 P.3d 135, 140 (Colo. 2010).  In response, the People assert that Martinez failed to preserve the issue because his counsel objected "on grounds different from those raised on appeal."  *People v. Ujaama*, 2012 COA 36, ¶ 37, 302 P.3d 296, 304.

¶ 54    Because we conclude that the prosecutor did not engage in misconduct, we need not resolve this dispute.  *See Hagos*, ¶ 9, 288 P.3d at 118 (explaining that preservation affects the standard of review that we employ "to determine whether an error in criminal proceedings necessitates reversal of the judgment of conviction").

### 3. Legal Authority

¶ 55    A prosecutor may attack a defendant's credibility during closing argument as long as the attack is based on the evidence in

the record or a reasonable inference from that evidence. *See Martinez*, 244 P.3d at 140-41; *People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006) ("[A] prosecutor has wide latitude and may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence."). The prosecutor may do so through a "tailoring argument," in which the prosecutor asserts that, by virtue of the defendant's presence at trial, the defendant "tailor[ed] his testimony to fit that of other witnesses." *Martinez*, 244 P.3d at 141-42.

¶ 56    While a prosecutor may not make generic tailoring arguments, the prosecutor may make specific tailoring arguments. *Id.* "Generic tailoring arguments occur when the prosecution attacks the defendant's credibility by simply drawing the jury's attention to the defendant's presence at trial and his resultant opportunity to tailor his testimony." *Id.* These arguments are improper because "they are not based on reasonable inferences from evidence in the record," and they imply that the defendant is less believable because he or she exercised the right of confrontation and upheld his or her statutory duty to be present at trial. *Id.*; *see People v. Knapp*, 2020 COA 107, ¶¶ 58-59, ___ P.3d ___, ___ (deciding that

24

the prosecutor made an improper generic tailoring argument by telling the jury that the defendant "got to sit and listen to the evidence, and then testify, based upon the evidence heard in court"); *see also* Crim. P. 43(a).

¶ 57    In contrast, a specific tailoring argument is "tied to evidence in the record.  In such circumstances, it is reasonable for the jury to draw inferences regarding the credibility of the defendant." *Martinez*, 244 P.3d at 141; *see State v. Weatherspoon*, 212 A.3d 208, 221 (Conn. 2019) (holding that prosecutor's reference to conflicting versions of events offered by sexual assault victim and by defendant, followed by suggestion that defendant's version was fabricated, constituted specific tailoring because the argument was "tied to evidence that supported such an inference").

4.    The Prosecutor Did Not Present a Generic Tailoring Argument

¶ 58    During closing argument, the prosecutor argued,

> the defendant also wants you to believe that
> when the true target of [A.R.'s] affection . . .
> rebuffed her advances twice, that she was
> completely unfazed.  This drunken girl didn't
> think a thing of it, and instead what she
> started doing was passing out her weed,
> passing out her weed like candy to every
> person who was standing there, not to smoke

it; that might make a little bit of sense. But nobody smoked.

[Martinez] can't tell you that, because there's no evidence that there is marijuana in [A.R.'s] urine results. And so, instead, he tells you this unrealistic story that she just, out of the kindness of her heart, decides to pass out her weed to everybody. Well, why? Why does he have to tell you that story? Well, because that's the thing that she's missing.

Because, otherwise, how does he explain the one thing that's missing from her stuff, right? Unless he's gone through it. That's the alternative. So instead, she just passed it out like candy, and that's the explanation for why she no longer has that or her pipe at the end of the event.

¶ 59    We disagree with Martinez's assertion that the prosecutor's comments constituted a generic tailoring argument. Although the prosecutor argued that Martinez tailored his testimony to fit other witnesses' testimony, the prosecutor tied her argument to evidence in the record. *Martinez*, 244 P.3d at 141-42. She specifically referenced Martinez's testimony concerning A.R.'s missing marijuana and pipe and asked the jury to infer that Martinez's account lacked credibility. This was a proper specific tailoring argument. *See id.*; *People v. Constant*, 645 P.2d 843, 845-46 (Colo. 1982) ("Counsel can with propriety comment on how well and in

26

what manner a witness measures up to the tests of credibility set forth in the [jury] instruction."); *Weatherspoon*, 212 A.3d at 221 (providing example of specific tailoring). Thus, the district court did not err by permitting the prosecutor to present a tailoring argument.

## C. The Detective's Testimony

¶ 60 Martinez contends that the district court plainly erred by permitting the prosecutor to elicit expert testimony from the detective without designating or qualifying the detective as an expert witness. We conclude that the detective's testimony was improper, but, given the detective's qualifications and the unsurprising nature of his testimony, we hold that the admission of the testimony did not constitute plain error.

### 1. Standard of Review

¶ 61 We review a trial court's evidentiary rulings, including the admission of expert testimony, for an abuse of discretion. *Venalonzo v. People*, 2017 CO 9, ¶¶ 15, 24, 388 P.3d 868, 873, 875. "A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law." *Williams*, ¶ 21, 446 P.3d at 950.

27

¶ 62     Unless the error was structural (which Martinez does not argue here), we review errors that were not preserved by timely objection for plain error. *Hagos*, ¶ 14, 288 P.3d at 120. Plain error is "obvious and substantial." *Id.* "We reverse under plain error review only if the error 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Id.* (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

## 2.     Legal Authority

¶ 63     A trial court abuses its discretion by admitting expert testimony under the guise of lay opinion. *Stewart*, 55 P.3d at 124 ("[W]here . . . an officer's testimony is based not only on [his] perceptions and observations of the crime scene, but also on [his] specialized training or education, []he must be properly qualified as an expert before offering testimony that amounts to expert testimony."). "[S]uch a substitution subverts the disclosure and discovery requirements of [the rules of criminal procedure] and the reliability requirements for expert testimony." *Id.* at 123 (quoting *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001)); *see* Crim. P. 16(I)(a)(1)(III) (providing that "[t]he prosecuting attorney

28

shall make available to the defense . . . [a]ny reports or statements

of experts made in connection with the particular case").

¶ 64     In *Venalonzo,* the supreme court discussed the distinction

between lay and expert testimony, explaining that

> [t]ogether, CRE 701 and 702 distinguish lay testimony from expert testimony.  CRE 701 defines the scope of lay witness opinion testimony.  It provides that lay witness testimony in the form of opinions or inferences must be "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [CRE] 702."  CRE 702, on the other hand, concerns the admissibility of expert testimony.  Under this rule, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

¶ 18, 388 P.3d at 874 (citation omitted); *see* CRE 701 & 702.

¶ 65     The *Venalonzo* court held that, "in determining whether

testimony is lay testimony under CRE 701 or expert testimony

under CRE 702, the trial court must look to the basis for the

opinion."  *Venalonzo,* ¶ 23, 388 P.3d at 875.  A witness offers lay

29

testimony if the testimony "could be expected to be based on an ordinary person's experiences or knowledge," while a witness offers expert testimony if the testimony "could not be offered without specialized experiences, knowledge, or training." *Id.* This inquiry "depends on the facts and surrounding circumstances of the case and 'requires a case-by-case analysis of both the witness and the witness's opinion.'" *Id.* at ¶ 17, 388 P.3d at 874 (quoting *United States v. Smith*, 591 F.3d 974, 982-83 (8th Cir. 2010)).

3. The District Court Erred by Allowing the Detective to Present Expert Testimony

¶ 66 Martinez's counsel filed a pretrial motion requesting the disclosure of the prosecution's expert witnesses under Rule 16(I)(a)(1)(III). The prosecutor did not endorse the detective as an expert witness.

¶ 67 The detective began his testimony by summarizing his background, training, and experience, stating that he

- "went through a six-month police academy";

- "worked in the patrol division . . . for approximately seven years";

30

- contacted "hundreds" of intoxicated people while working;

- received on-the-job training and "continuing education" classes;

- had worked as a sex crimes detective for over four years;

- took part in "special training" to learn how to investigate sexual assaults; and

- had investigated "close to 500" sex assault cases in his career.

Despite this testimony regarding the detective's background, training, and experience, the prosecutor did not seek to qualify him as an expert witness.

¶ 68    After testifying about his investigation of A.R.'s case, the detective responded to a question about A.R.'s demeanor: "she went through different phases, like most people do . . . ." He added that, based on his interviews of "a fair number of victims," A.R.'s response was not "surprising."

¶ 69    The following exchange occurred later during the detective's examination:

[PROSECUTOR:] Now, you said earlier you've been involved in about 500 sex assault investigations. In your training and experience, is it usual for a victim of a sex assault to not have significant physical injuries?

[DETECTIVE:] No. Again, much like reactions, depending on the circumstances of the sexual assault, we don't expect to see, necessarily, injuries, unless there's an indication that there was some sort of physical attack, as well.

Again, depending upon the circumstances . . . when we talk about things like what would commonly be referred to as "date rape" or situations like that, or circumstances in which people are what's labeled "victim incapable" . . . where they're inebriated or drugged or something to that effect, you're not necessarily going to see an injury. There's no expectation for that one way or the other.

[PROSECUTOR:] Okay. And specifically on those "victim incapable" cases you talked about, where the victim was too intoxicated, is it your experience that there would be little or no injury?

[DETECTIVE:] Generally speaking, there wouldn't be, because they're not in a position to offer any kind of physical resistance.

¶ 70    We conclude that the detective's opinions amounted to impermissible expert testimony because such testimony "could not be offered without specialized experiences, knowledge, or training."

32

*Id.* at ¶ 23, 388 P.3d at 875. An "ordinary person" does not possess the requisite "experiences or knowledge" to testify about the type or extent of injuries resulting from a sexual assault or the victim's demeanor during a police interview following a sexual assault. *See, e.g., State v. Fortin*, 917 A.2d 746, 757 (N.J. 2007) ("We do not presume that the ordinary juror would have knowledge of the typical injuries inflicted during a . . . sexual assault."); *see also People v. Rincon*, 140 P.3d 976, 983 (Colo. App. 2005) (holding that an officer may testify as a lay witness about topics that may be resolved by "simple common sense and logic"). Rather, a person could be expected to possess this information only if he or she had been specially trained or otherwise had experience with sexual assaults; under these circumstances, "common sense and logic" do not provide answers to the prosecutor's questions.

¶ 71 Indeed, immediately before the detective testified about these topics, the prosecutor emphasized the detective's specialized training and experience. The detective then compared his observations regarding A.R.'s case to his experience with the hundreds of other sexual assault cases he had investigated. *See People v. Glasser*, 293 P.3d 68, 78 (Colo. App. 2011) ("[E]xperts may

33

testify concerning whether a victim's behavior or demeanor is consistent with the typical behavior of victims of abuse."). Given that the detective could have gathered the information supporting his testimony only through his "specialized experiences, knowledge, [and] training," he offered expert testimony. *Venalonzo*, ¶ 23, 388 P.3d at 875. And because the prosecutor failed to endorse the detective as an expert witness, the detective's testimony was improper. *See* Crim. P. 16(I)(d); *Stewart*, 55 P.3d at 124.

¶ 72    Thus, the district court abused its discretion by permitting the detective to testify about the injuries and demeanor that victims of sexual assault typically display. *See Williams*, ¶ 21, 446 P.3d at 950 ("A trial court abuses its discretion . . . when it misapplies the law.").

4.    The Admission of the Detective's Testimony Did Not Constitute Plain Error

¶ 73    We review Martinez's challenge to the detective's testimony under the plain error standard because Martinez's counsel did not make a contemporaneous objection to the testimony. *See Hagos*, ¶ 14, 288 P.3d at 120. In determining whether the admission of the detective's opinion testimony resulted in plain error, we consider

whether the detective was qualified to offer those opinions based on his training and experience. *See People v. Conyac*, 2014 COA 8M, ¶ 67, 361 P.3d 1005, 1021; *People v. Malloy*, 178 P.3d 1283, 1288-89 (Colo. App. 2008); *see also People v. Lomanaco*, 802 P.2d 1143, 1145 (Colo. App. 1990) (holding that there was no plain error in the admission of unendorsed expert testimony when the witness was qualified to provide that testimony).

¶ 74 We discern no plain error for three reasons. First, the detective was qualified to provide the opinions. Through his investigations of "close to 500" sexual assault cases over more than four years, the detective undoubtedly gained the experience necessary to testify about the typical injuries of victims of sexual assault, as well as sexual assault victims' behavior and demeanor during police interviews.

¶ 75 Second, the failure of Martinez's counsel to object to the detective's testimony or request a continuance after the jury heard it "belies any claim that he was surprised or prejudiced by [such] testimony." *People v. Brown*, 313 P.3d 608, 617 (Colo. App. 2011).

¶ 76 Third, as discussed in detail above, the evidence against Martinez was overwhelming. *See supra* Part II.A.5; *see also Miller*,

113 P.3d at 750 (holding that a trial court's error "does not normally constitute plain error . . . where the record contains overwhelming evidence of the defendant's guilt").

¶ 77     We therefore conclude that there was no plain error because the district court's failure to sua sponte exclude the detective's expert testimony did not "undermine[] the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 14, 288 P.3d at 120 (quoting *Miller,* 113 P.3d at 750).

### D.     Martinez's Theory of Defense Instruction

¶ 78     Martinez asserts that the district court erred by refusing to give the jury his tendered theory of defense instruction.  We discern no error.

### 1.     Standard of Review

¶ 79     We review a trial court's decision to modify a tendered theory of defense instruction for an abuse of discretion.  *People v. Bruno*, 2014 COA 158, ¶ 18, 342 P.3d 587, 591; *see People v. Lee*, 30 P.3d 686, 689 (Colo. App. 2000) ("The trial court has substantial discretion in the drafting of a theory of defense instruction.").

¶ 80    In analyzing whether the trial court abused its discretion, we review the instructions as a whole to determine whether the jury was "adequately informed of the defendant's theory of defense." *People v. Dore*, 997 P.2d 1214, 1222 (Colo. App. 1999).

### 2.    Legal Authority

¶ 81    "[A]n instruction embodying a defendant's theory of the case *must be given* by the trial court if the record contains any evidence to support the theory." *People v. Nunez*, 841 P.2d 261, 264 (Colo. 1992). "A proper theory of the case instruction should explain a defendant's view of what the evidence shows, must be general and brief, and must instruct the jury on the legal effect of the explanation." *People v. Meads*, 58 P.3d 1137, 1138 (Colo. App. 2002), *aff'd,* 78 P.3d 290 (Colo. 2003).

¶ 82    A trial court may refuse to give an instruction that is "argumentative, contains errors of law, merely reiterates portions of the evidence, or is encompassed within the other instructions." *Lee*, 30 P.3d at 689; *see Dore*, 997 P.2d at 1221-22 ("The trial court may reject a theory of the case instruction which tends to be argumentative or calls attention to specific evidence."). If the trial court refuses to give an instruction, it "has an affirmative obligation

37

to cooperate with counsel to either correct the tendered theory of the case instruction or to incorporate the substance of such in an instruction drafted by the court." *Nunez*, 841 P.2d at 265.

### 3. The District Court Did Not Err by Modifying Martinez's Tendered Theory of Defense Instruction

¶ 83 Martinez's counsel tendered the following theory of defense instruction:

> [o]n the evening of June 29, 2015 [Martinez] was hanging out, drinking alcohol and smoking marijuana in a park in lower downtown with a small group of friends. Later in the evening [A.R.] approached Mr. Martinez and his friends. [A.R.] first attempted to engage in a sexual relationship with Mr. Martinez's friend J.K. After, she learned that he had a girlfriend and wasn't interested in engaging in a sexual relationship with her she began speaking more exclusively with Mr. Martinez. After a period of time Mr. Martinez and [A.R.] agreed to separate from the group to engage in consensual sex. While Mr. Martinez observed some slight signs of impairment from [A.R.] there wasn't anything about her words or physical demeanor to indicate to him that she was not fully aware of what she was saying a [sic] doing.

¶ 84 Noting that "theories of the case should not be argumentative," the district court declined to give Martinez's tendered instruction. Instead, over the objection of Martinez's counsel, the court modified

the instruction to read, "[i]t is Mr. Martinez's theory of the case that, although he observed signs of impairment from [A.R.], [A.R.] engaged in a consensual sexual relationship with him."

¶ 85    The district court did not abuse its discretion by rejecting and modifying Martinez's theory of defense instruction.  As the court correctly noted, the final sentence in Martinez's tendered instruction was argumentative.  Additionally, the instruction was not "general and brief" and did not "instruct the jury on the legal effect of the explanation." *Meads*, 58 P.3d at 1138.  Rather, by focusing solely on Martinez's testimony, the instruction "merely reiterate[d] portions of the evidence" that were favorable to him. *Lee*, 30 P.3d at 689; *see Dore*, 997 P.2d at 1221-22.  Martinez was not entitled to a theory of defense instruction that unduly emphasized his trial testimony that nothing about A.R.'s actions or demeanor indicated that she was not fully aware of her actions. *See People v. Baird*, 66 P.3d 183, 194 (Colo. App. 2002) ("[A] trial court may refuse an instruction if it . . . unduly emphasizes particular evidence . . . .").

¶ 86    The district court's redrafted instruction was proper because it excised the problematic components of Martinez's tendered

instruction while providing Martinez's theory of defense that A.R. did not appear to be incapable of appraising the nature of her conduct when he and A.R. had sex. The court fulfilled its obligation under *Nunez* to include "the substance" of Martinez's tendered instruction in the final jury instruction and, thus, did not err in doing so. 841 P.2d at 265.

## E. Cumulative Error

¶ 87 Martinez asserts that the trial court's cumulative errors deprived him of a fair trial. We disagree.

¶ 88 The supreme court discussed the applicability of the cumulative error doctrine in *Howard-Walker v. People*, explaining that "[t]hough an error, when viewed in isolation, may be harmless or not affect the defendant's substantial rights, reversal will nevertheless be required when 'the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process.'" 2019 CO 69, ¶ 24, 443 P.3d 1007, 1011 (quoting *People v. Lucero*, 200 Colo. 335, 344, 615 P.2d 660, 666 (1980)). The court added, "[f]or reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial

rights of the defendant, even if any single error does not. Stated simply, cumulative error involves cumulative prejudice." *Id.* at ¶ 25, 443 P.3d at 1011 (citation omitted).

¶ 89 Here, although we identified two errors, there is no reversible cumulative error because those errors did not substantially prejudice Martinez's right to a fair trial, as discussed above. *See supra* Parts II.A.5, II.C.4. Even when we view the errors in combination, given the overwhelming evidence of guilt, we cannot conclude "that the cumulative effect of the errors substantially prejudiced [Martinez's] right to a fair trial." *People v. Mendenhall*, 2015 COA 107M, ¶ 82, 363 P.3d 758, 775; *see also Conyac*, ¶ 152, 361 P.3d at 1030 ("[A]lthough we have found some errors, because we do not perceive that they substantially prejudiced defendant's right to a fair trial, there is no reversible cumulative error.").

F. SOLSA's Constitutionality

¶ 90 In attacking the constitutionality of SOLSA, Martinez concedes two points: divisions of this court have rejected facial challenges to SOLSA's constitutionality, *see, e.g.*, *People v. Lehmkuhl*, 117 P.3d 98, 108 (Colo. App. 2004), and he did not advance this argument before the district court. He nonetheless contends that SOLSA

41

violates separation of power principles and his right to due process, right of equal protection, right against cruel and unusual punishment, and right against self-incrimination. Martinez, however, fails to explain how SOLSA violates his constitutional rights and how the divisions that previously addressed this issue erred. We therefore decline to depart from the decisions affirming SOLSA's constitutionality, *see, e.g.*, *People v. Sabell*, 2018 COA 85, ¶ 47, 452 P.3d 91, 100, and hold that the district court did not plainly err in sentencing Martinez under the mandates of SOLSA.

## III. Conclusion

¶ 91 Martinez's judgment of conviction is affirmed.

JUDGE NAVARRO and JUDGE TOW concur.