21CA1967 Peo v Al-Khammasi 07-03-2024 COLORADO COURT OF APPEALS Court of Appeals No. 21CA1967 El Paso County District Court No. 18CR4614 Honorable Jann P. DuBois, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Karrar Noaman Al-Khammasi, Defendant-Appellant. JUDGMENT AFFIRMED Division VI Opinion by JUDGE WELLING Yun and Lum, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 3, 2024 Philip J. Weiser, Attorney General, Claire V. Collins, Assistant Attorney General, Daniel R. Magalotti, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, Emily Hessler, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendant, Karrar Noaman Al-Khammasi, appeals his judgment of conviction for six felonies and one misdemeanor. We affirm. I. Background ¶ 2 After a night out drinking, Al-Khammasi was intoxicated, and upon leaving the bar, he became “aggressive” toward another bar patron. He got into an Uber to go home but began arguing with the driver about whether she was going to give him a ride and at that point purportedly told the driver she “would regret it.” ¶ 3 Al-Khammasi then got out of the car and walked down the street, and as he was walking, he began shooting a gun into the air. At least one witness called 911, and multiple officers responded. Officer C.D. was the first responding officer to locate Al-Khammasi, and he got out of his patrol car alone to confront Al-Khammasi. ¶ 4 The exact details of the events that followed are unclear, but evidence presented at trial supports that Officer C.D. and Al-Khammasi each shot at the other and that both were injured as a result. ¶ 5 Corporal Ronald Carter, who arrived right as the exchange of gunfire between Al-Khammasi and Officer C.D. occurred, testified 
2 that, when he arrived, he could see Al-Khammasi illuminated, likely by Officer C.D.’s flashlight. Evidence was also presented that Officer C.D. had the bright “takedown lights” on his patrol car illuminated and pointed at Al-Khammasi at the time of the shooting. Soon after he arrived, Corporal Carter saw Al-Khammasi “reach[] for his right side . . . waistband area.” He didn’t, however, see Al-Khammasi with a gun at that point. According to Corporal Carter, “[o]nce [he] saw [Al-Khammasi] reaching, it went dark,” and he then heard two gunshots “pretty close together.” After Corporal Carter heard gunfire, he saw Officer C.D. and Al-Khammasi fall to the ground. Corporal Carter then approached Al-Khammasi and fired his gun at him because Al-Khammasi still had a “gun in his hand.” According to another officer, Al-Khammasi and Officer C.D. were about ten to twenty feet away from one another when they were found. ¶ 6 Officer C.D. was shot in the left side of the head and sustained a brain injury that caused him to lose motor function in his right arm (the arm he used to shoot with). Though gravely injured, Officer C.D. survived. Al-Khammasi sustained non-life-threatening injuries. 
3 ¶ 7 Investigators later found seven shell casings between the bar and the area where the shooting occurred. Investigators didn’t find evidence that Al-Khammasi had shot at Officer C.D. while Officer C.D. was in his patrol car. ¶ 8 The People charged Al-Khammasi with the following eight criminal offenses: attempt to commit murder in the first degree (extreme indifference), attempt to commit murder in the first degree (after deliberation), assault in the first degree (deadly weapon), assault in the first degree (peace officer), assault in the first degree (extreme indifference), felony menacing, prohibited use of a weapon (reckless with gun), and possession of a weapon by a previous offender (POWPO). Al-Khammasi proceeded to a jury trial on all counts except POWPO, which had been bifurcated at Al-Khammasi’s request. At trial, Al-Khammasi raised the affirmative defenses of self-defense and voluntary intoxication. ¶ 9 The jury acquitted Al-Khammasi of attempt to commit murder in the first degree (extreme indifference) but convicted him of the remaining six charges presented to them at trial. After the jury returned its verdict, Al-Khammasi pleaded guilty to the POWPO charge. 
4 II. Analysis ¶ 10 Al-Khammasi raises five arguments on appeal. First, he contends that the trial court erred by instructing the jury on the initial aggressor exception to self-defense. Second, he contends that the trial court erred by instructing the jury on the use of “deadly” physical force in defense of person even though he wasn’t charged with using “deadly” force because Officer C.D. had survived. Third, Al-Khammasi contends that the trial court erred by excluding his out-of-court statements. Fourth, he contends that the trial court erred by admitting extrinsic character evidence subject to CRE 404(b) without first performing the balancing test set forth in People v. Spoto, 795 P.2d 1314, 1318 (Colo. 1990), and by not giving a limiting instruction to the jury. Fifth, he contends that we should review Officer C.D.’s and Corporal Carter’s internal police records to determine whether the trial court erred by not disclosing some or all of the documents to the defense. ¶ 11 We aren’t persuaded that the court committed reversible error on any of the grounds advanced by Al-Khammasi, so we affirm his convictions. We also affirm the trial court’s decision to deny 
5 Al-Khammasi access to any documents in Officer C.D.’s or Corporal Carter’s internal police records. A. Whether the Trial Court Erred by Giving the Initial Aggressor Instruction ¶ 12 Al-Khammasi contends that the trial court plainly erred by instructing the jury on the initial aggressor exception to self-
defense. According to Al-Khammasi, there was “no evidence” that Al-Khammasi was the initial aggressor, and by giving the instruction, the trial court lowered the prosecution’s burden of proof and violated his right to present a defense. We disagree. 1. Additional Facts ¶ 13 Although Al-Khammasi didn’t testify, defense counsel argued in closing arguments that he acted in self-defense because he didn’t know Officer C.D. was a police officer, so “when he saw a shining spotlight coming at him from a block away and a man get out with a gun, his gut reaction was to protect his own life.” Defense counsel further argued as follows: • Al-Khammasi reasonably perceived a threat because “Officer [C.D.] got out of his car with a gun and immediately aimed.” 
6 • Officer C.D. shot Al-Khammasi first because Officer C.D. was right-handed and, after being shot in the left side of his brain, he would have lost all motor function in his right arm and, therefore, couldn’t have shot Al-Khammasi afterward. • Al-Khammasi wasn’t the initial aggressor because he was shooting his gun randomly in the air, not at another person or at Officer C.D.’s car as he drove up. ¶ 14 At trial, the court instructed the jury on self-defense as an affirmative defense (Instruction 23) and as an element-negating traverse (Instruction 24). The initial aggressor exception to self-
defense was included in both instructions. ¶ 15 Instruction 23 read, in relevant part, as follows: The defendant was legally authorized to use deadly physical force upon another person without first retreating if . . . he was not the initial aggressor, or, if he was the initial aggressor, he had withdrawn from the encounter and effectively communicated to the other person his intent to do so, and the other person nevertheless continued or threatened the use of unlawful physical force. ¶ 16 Similarly, Instruction 24, read in relevant part, as follows: 
7 [A] person is not justified in using deadly physical force if: he is the initial aggressor; except that his use of deadly physical force upon another person under the circumstances is justifiable if he withdraws from the encounter and effectively communicates to the other person his intent to do so, but the other person nevertheless continues or threatens the use of unlawful physical force. ¶ 17 Al-Khammasi didn’t object to the inclusion of the initial aggressor language in either instruction. 2. Standard of Review and Legal Principles ¶ 18 “A trial court may instruct the jury on an exception to an asserted affirmative defense if ‘some evidence’ supports the exception.” People v. Roberts-Bicking, 2021 COA 12, ¶ 31. In the context of the initial aggressor exception to self-defense, there is “some evidence” if the evidence is such that it “would support a reasonable inference that the accused was the initial aggressor.” Id. If evidence is presented that “suggests the defendant initiated the physical conflict by using or threatening imminent use of unlawful physical force” then the initial aggressor instruction is warranted. Id. at ¶ 33. 
8 ¶ 19 We review de novo whether there is sufficient evidence to “support[] an instruction on the initial aggressor exception to self-
defense.” People v. Whiteaker, 2022 COA 84, ¶ 34, rev’d on other grounds, 2024 CO 25. A trial court doesn’t err if the instructions given “adequately inform the jury of the law.” Galvan v. People, 2020 CO 82, ¶ 40 (quoting People v. Vanrees, 125 P.3d 403, 410 (Colo. 2005)). If a defendant fails to object to a jury instruction, then we review for plain error. People v. Roadcap, 78 P.3d 1108, 1113 (Colo. App. 2003). A trial court plainly errs if the error is obvious and substantial. Hagos v. People, 2012 CO 63, ¶ 14. 3. The Trial Court Didn’t Err ¶ 20 There was sufficient evidence presented at trial to warrant the trial court including the initial aggressor exception as part of its self-defense instructions. ¶ 21 To begin, the evidence presented at trial supported that the police were called to the scene based on reports that Al-Khammasi was shooting a gun. Further, although Corporal Carter testified that he didn’t initially see Al-Khammasi with a gun when he arrived, Corporal Carter saw Al-Khammasi reach toward his waistband right before he heard shots. This aligns with testimony 
9 from a different witness that she had seen Al-Khammasi with a gun near his waistband. These facts taken together offer some evidence that Al-Khammasi threatened imminent and unlawful force against Officer C.D. ¶ 22 In asserting that there isn’t evidence that he was the initial aggressor, Al-Khammasi alludes to the argument he made at trial that, because Officer C.D. was shot in the left side of his head causing a loss in motor function to his right arm (his shooting arm), Officer C.D. must have shot Al-Khammasi first and therefore Al-Khammasi couldn’t have been the initial aggressor. Even if we were persuaded that the evidence undoubtedly established that Officer C.D. shot first — which we aren’t — that doesn’t mean that Al-Khammasi couldn’t have been the initial aggressor. Such a contention improperly conflates being the first shooter with being the initial aggressor. At the time he shot Al-Khammasi, Officer C.D. could have been responding to Al-Khammasi’s threat of “imminent use of unlawful physical force,” making Al-Khammasi the initial aggressor. Roberts-Bicking, ¶ 33 (citing Castillo v. People, 2018 CO 62, ¶¶ 43, 50-51). The bottom line is that, regardless of who shot 
10 first, there is at least some evidence that Al-Khammasi was the initial aggressor. ¶ 23 Because there is some evidence that Al-Khammasi was the initial aggressor, the trial court didn’t err — much less plainly err — by including the initial aggressor exception in the self-defense instructions. B. Whether the Trial Court Erred by Giving a Deadly Physical Force Instruction to the Jury ¶ 24 Al-Khammasi contends that the trial court plainly erred by giving the jury the self-defense instruction for use of deadly force because Al-Khammasi didn’t kill Officer C.D. We agree with the People that this error wasn’t plain and thus doesn’t require reversal. 1. Standard of Review ¶ 25 A “court has substantial discretion in formulating the jury instructions, so long as they are correct statements of the law and fairly and adequately cover the issues presented.” People v. Nerud, 2015 COA 27, ¶ 35 (quoting People v. Gallegos, 226 P.3d 1112, 1115 (Colo. App. 2009)). But the trial court must not give the jury an instruction that misstates the law. See, e.g., People v. Mandez, 997 P.2d 1254, 1270 (Colo. App. 1999). We review whether an 
11 instruction “accurately informed the jury of the governing law” de novo. People v. Paglione, 2014 COA 54, ¶ 45. ¶ 26 If a defendant fails to preserve an error, we review for plain error. Hagos, ¶ 14. Under the plain error standard, the error must be obvious and substantial, and we reverse “only if the error ‘so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.’” Id. (quoting People v. Miller, 113 P.3d 743, 750 (Colo. 2005)). 2. The Trial Court Erred ¶ 27 After approval by the prosecutor and defense counsel, the trial court gave the jury two instructions relating to self-defense, Instruction 23 and Instruction 24. Both Instruction 23 and Instruction 24 instructed the jury on the use of deadly physical force in defense of person. ¶ 28 The People concede, and we agree, that the trial court obviously erred by instructing the jury on the use of deadly physical force rather than non-deadly physical force. Our criminal code differentiates between deadly and non-deadly physical force in defense of person. § 18-1-704(1), (2)(a)-(c), C.R.S. 2023. Deadly physical force is defined as “force, the intended, natural, and 
12 probable consequence of which is to produce death, and which does, in fact, produce death.” § 18-1-901(3)(d), C.R.S. 2023 (emphasis added). For this reason, divisions of this court have held that it’s error for the trial court to give the jury a deadly physical force in defense of person instruction when the victim didn’t die. See People v. Ferguson, 43 P.3d 705, 707-08 (Colo. App. 2001) (holding that the trial court’s instructional error wasn’t harmless because the erroneous instruction permitted the jury “to hold [the] defendant to a higher standard in establishing self-defense than is required by law”); People v. Ramirez, 2019 COA 16, ¶ 27 (holding that giving the deadly force instruction where the victim survived was obvious error). ¶ 29 Because both Instruction 23 and Instruction 24 instructed the jury on the use of deadly physical force in defense of person rather than non-deadly physical force, the trial court obviously erred. Now we turn to whether this obvious error merits reversal. 3. The Trial Court’s Error Didn’t Prejudice Al-Khammasi ¶ 30 Despite the trial court’s obvious error, we can’t discern a path in which the jury rejected Al-Khammasi’s theory of self-defense 
13 based on language erroneously included in either Instruction 23 or Instruction 24. a. Instruction 23 ¶ 31 We begin our analysis with the similarities and differences between Instruction 23 and the pattern criminal jury instructions for the use of non-deadly physical force in defense of person. ¶ 32 Instruction 23 related to self-defense as an affirmative defense and read as follows: The evidence presented in this case has raised the affirmative defense of “deadly physical force in defense of person,” as a defense to Criminal Attempt to Commit Murder [in] the First Degree (After Deliberation), Assault in the First Degree (Deadly Weapon), First Degree Assault (Peace Officer) and Menacing The defendant was legally authorized to use deadly physical force upon another person without first retreating if: 1. he used that deadly physical force in order to defend himself from what he reasonably believed to be the use or imminent use of unlawful physical force by that other person, and 2. he reasonably believed a lesser degree of force was inadequate, and 3. he had a reasonable ground to believe, and did believe, that he or another person was in 
14 imminent danger of being killed or of receiving great bodily injury, and 4. he was not the initial aggressor, or, if he was the initial aggressor, he had withdrawn from the encounter and effectively communicated to the other person his intent to do so, and the other person nevertheless continued or threatened the use of unlawful physical force. (Emphasis added.) Instruction 23 closely aligns with the pattern instruction “Use of Deadly Physical Force (Defense of Person).” COLJI-Crim. H:12 (2023). ¶ 33 There is also a pattern instruction for the “Use of Non-Deadly Physical Force (Defense of Person).” COLJI-Crim. H:11 (2023). This pattern instruction appears to be identical to Instruction 23, except as italicized below: The defendant was legally authorized to use physical force upon another person without first retreating if: 1. he [she] used that physical force in order to defend himself [herself] or a third person from what he [she] reasonably believed to be the use or imminent use of unlawful physical force by that other person . . . , and 2. he [she] used a degree of force which he [she] reasonably believed to be necessary for that purpose, and . . . . 
15 4. he [she] was not the initial aggressor, or, if he [she] was the initial aggressor, he [she] had withdrawn from the encounter and effectively communicated to the other person his [her] intent to do so, and the other person nevertheless continued or threatened the use of unlawful physical force. COLJI-Crim. H:11 (emphasis added). ¶ 34 The jury instructions for attempt to commit murder in the first degree (after deliberation), assault in the first degree (deadly weapon), assault in the first degree (peace officer), and felony menacing contained the element that “the defendant’s conduct was not legally authorized by the affirmative defense in Instruction 23.” ¶ 35 According to both Instruction 23 and COLJI-Crim. H:11, the jury must reject the affirmative defense of self-defense if the People disprove, beyond a reasonable doubt, any one of the numbered conditions within the self-defense instruction. ¶ 36 Thus, based on Instruction 23, the jury could have rejected Al-Khammasi’s claim of self-defense if it found that any one of the following were not true: 1. [Al-Khammasi] used that deadly physical force in order to defend himself from what he reasonably believed to be the use or imminent use of unlawful physical force by that other person . . . 
16 2. [Al-Khammasi] reasonably believed a lesser degree of force was inadequate . . . 3. [Al-Khammasi] had a reasonable ground to believe, and did believe, that he or another person was in imminent danger of being killed or of receiving great bodily injury . . . 4. [Al-Khammasi] was not the initial aggressor, or, if he was the initial aggressor, he had withdrawn from the encounter and effectively communicated to the other person his intent to do so, and the other person nevertheless continued or threatened the use of unlawful physical force. ¶ 37 Except for the inclusion of the word “deadly” in the first condition of the instruction, condition one and condition four of Instruction 23 are the same as the pattern instruction for the Use of Non-Deadly Physical Force (Defense of Person).
1 See COLJI-Crim. H:11. Although erroneous, the inclusion of the word “deadly” in the first condition didn’t lower the People’s burden of proof with respect to disproving self-defense because whether Al-Khammasi used 1 COLJI-Crim. H:11 (2023) also includes protection of another person, specifically stating “in order to defend himself or a third person.” (Emphasis added.) Because there is no evidence that Al-Khammasi was protecting a third person, this language is irrelevant to our analysis. 
17 deadly physical force wasn’t a condition that the People had to disprove. ¶ 38 Thus, regardless of whether or not the jury received the proper instruction, if the jury found beyond a reasonable doubt either that Al-Khammasi didn’t reasonably believe that he faced the use or imminent use of unlawful force by Officer C.D. (condition one) or that he was the initial aggressor (condition four), the jury would have been required to reject Al-Khammasi’s affirmative defense of self-defense. ¶ 39 Put differently, for the erroneous instruction to have affected the outcome of the verdict, the jury would have had to reject Al-Khammasi’s self-defense theory based solely on either condition two or three of Instruction 23. Given the evidence presented about the events surrounding the shooting, however, it isn’t plausible that the jury rejected self-defense on either of these grounds. ¶ 40 We first address condition two, that “[Al-Khammasi] reasonably believed a lesser degree of force was inadequate.” Evidence presented at trial established that Officer C.D. aimed a gun at Al-Khammasi and that Al-Khammasi was some distance from Officer C.D. Because Al-Khammasi faced a deadly weapon 
18 from a distance, it simply isn’t plausible that the jury rejected self-
defense on the basis that he didn’t reasonably believe that a lesser degree of force was inadequate. Had Al-Khammasi been otherwise justified in using self-defense, he wouldn’t have had any other option to meet the threat he faced given (1) his distance from Officer C.D. and (2) that Officer C.D. had a gun. ¶ 41 We next address condition three, that “[Al-Khammasi] had a reasonable ground to believe, and did believe, that he or another person was in imminent danger of being killed or of receiving great bodily injury.” Again, under Al-Khammasi’s theory of self-defense, Officer C.D. aimed a gun at him. Given that a gun is a deadly weapon, it isn’t plausible that the jury rejected self-defense on the basis that Al-Khammasi didn’t believe that he was in danger of being killed or gravely injured. 
19 ¶ 42 Thus, we can’t conclude that the jury rejected self-defense based on either condition two or three of Instruction 23.
2 b. Instruction 24 ¶ 43 For similar reasons, the erroneous language in Instruction 24 doesn’t undermine the reliability of the jury’s verdict. ¶ 44 Instruction 24 related to self-defense as an element-negating traverse and read as follows: The evidence presented in this case has raised the question of self-defense with respect to Criminal Attempt to Commit Murder in the First Degree (Extreme Indifference), and Assault in the First Degree (Extreme Indifference). A person is justified in using deadly physical force upon another person without first retreating in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person if he reasonably believes a lesser degree of force is inadequate, and: 2 We don’t reach the People’s argument that because the jury found that Al-Khammasi knew or should have known that Officer C.D. was a peace officer engaged in the performance of his duties, the jury necessarily rejected self-defense on the basis that Al-Khammasi didn’t face unlawful force. We don’t need to go that far to conclude that the trial court didn’t plainly err. It’s enough that any error doesn’t undermine our confidence in his conviction. 
20 he has a reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury However, a person is not justified in using deadly physical force if: he is the initial aggressor; except that his use of deadly physical force upon another person under the circumstances is justifiable if he withdraws from the encounter and effectively communicates to the other person his intent to do so, but the other person nevertheless continues or threatens the use of unlawful physical force. (Emphasis added.) Instruction 24 largely tracks the pattern instruction for “Use of Deadly Physical Force (Defense of Person — Offense With a Mens Rea of Recklessness, Extreme Indifference, or Criminal Negligence).” COLJI-Crim. H:14 (2023). ¶ 45 The pattern instruction for the “Use of Non-Deadly Physical Force (Defense of Person — Offense With a Mens Rea of Recklessness, Extreme Indifference, or Criminal Negligence),” COLJI-Crim. H:13 (2023), is consistent with Instruction 24, except as italicized in the following: A person is justified in using physical force upon another person without first retreating in order to defend himself [herself] [a third person] from what he [she] reasonably believes 
21 to be the use or imminent use of unlawful physical force by that other person, and he [she] may use a degree of force which he [she] reasonably believes to be necessary for that purpose. However, a person is not justified in using physical force if: . . . . he [she] is the initial aggressor; except that his [her] use of physical force upon another person under the circumstances is justifiable if he [she] withdraws from the encounter and effectively communicates to the other person his [her] intent to do so, but the other person nevertheless continues or threatens the use of unlawful physical force. COLJI-Crim. H:13 (emphasis added). ¶ 46 As an element-negating traverse, the People didn’t have to disprove Instruction 24 as an element of any of the charges against Al-Khammasi. Still, an inaccuracy of the instruction is potentially prejudicial because it may have affected the jury’s finding on whether or not he acted with extreme indifference, a finding that was critical to the elements of assault in the first degree (extreme indifference). ¶ 47 Based on Instruction 24, the jury could have rejected Al-Khammasi’s theory of self-defense if it found that any one of the 
22 following was not true: (1) “he reasonably believe[d] a lesser degree of force [was] inadequate”; (2) “he ha[d] a reasonable ground to believe, and [did] believe, that he or another person [was] in imminent danger of being killed or of receiving great bodily injury”; or (3) that he wasn’t the initial aggressor and didn’t “withdraw[] from the encounter and effectively communicate[] to [Officer C.D.] his intent to do so.” ¶ 48 Again, excepting the use of the word deadly, the initial aggressor portion of the instruction is the same as the pattern jury instruction for the Use of Non-Deadly Physical Force (Defense of Person — Offense With a Mens Rea of Recklessness, Extreme Indifference, or Criminal Negligence). See COLJI-Crim. H:13. Therefore, if the jury rejected self-defense on this basis, they would have rejected the theory even if the proper instruction had been given. ¶ 49 To summarize, for the erroneous instruction to have affected the jury’s verdict, the jury would have had to have rejected self-
defense solely on the grounds that either (1) Al-Khammasi didn’t “reasonably believe[] a lesser degree of force [was] inadequate” or (2) Al-Khammasi didn’t have “reasonable ground[s] to believe, and [did] 
23 believe, that he or another person [was] in imminent danger of being killed or receiving great bodily injury.” As we explained in our analysis of Instruction 23 in Part II.B.3.a above, Al-Khammasi faced the use of a deadly weapon from a distance of more than ten feet. Because of this, it isn’t plausible that the jury rejected self-defense on either of these grounds. ¶ 50 Thus, we can’t conclude that the trial court’s error “cast serious doubt on the reliability of the judgment of conviction” and, therefore, the trial court didn’t plainly err. Hagos, ¶ 14 (quoting Miller, 113 P.3d at 750). C. Al-Khammasi’s Hearsay Statements ¶ 51 While at the hospital for treatment of his injuries, Al-Khammasi made self-serving hearsay statements that the court excluded at trial. Al-Khammasi contends that the trial court reversibly erred by excluding his hearsay statements because there isn’t a rule against the admission of self-serving hearsay statements that are otherwise admissible under a hearsay exception. Al-Khammasi argues that his hearsay statements were admissible under (1) the excited utterance exception (CRE 803(2)); (2) the then existing mental, emotional, or physical condition exception (CRE 
24 803(3)); or (3) the residual hearsay exception (CRE 807). While we agree that the trial court erred to the extent that it excluded his statements as self-serving hearsay, we conclude that the trial court didn’t abuse its discretion by excluding the statements for failing to meet any of the proffered hearsay exceptions. 1. Additional Facts ¶ 52 A few hours after the shooting, an officer who wasn’t on the scene of the shooting, Sergeant Matthew McLain, went to the hospital to speak with Al-Khammasi. Sergeant McLain testified that he waited in Al-Khammasi’s hospital room after other officers had been unsuccessful in their attempts to speak with him. While in his hospital room, Sergeant McLain recorded an approximately seven-minute-long conversation with Al-Khammasi. ¶ 53 The conversation starts with a casual exchange in which Sergeant McLain asks Al-Khammasi basic biographical information, such as his address. Approximately three minutes into the recorded conversation, Sergeant McLain asks Al-Khammasi if he remembers what happened that night. Al-Khammasi responds by asking Sergeant McLain to tell him what had occurred. Sergeant McLain tells him that he “shot a cop.” From what we can discern 
25 from the audio clip, after this information was relayed to Al-Khammasi, the following occurred: • Approximately twenty-eight seconds after being told that he had shot a police officer, Al-Khammasi states, “[S]omebody shot me. I never shot a cop. I love cops.” • Approximately thirty-six seconds after being told that he had shot a police officer, Al-Khammasi states, “I not shot cop.” When he makes this statement, there appears to be a change in the inflection of his voice, as he begins to sound frustrated. • Approximately forty seconds after being told that he had shot a police officer, Al-Khammasi asks whether the officer died, and Sergeant McLain responds by saying he is “probably going to.” • Approximately four seconds after being told the officer would probably die and forty-seven seconds after being told that he had shot a police officer, Al-Khammasi, sounding upset, states, “[N]o way. No please. Swear to God. Promise.” 
26 • Approximately thirty-nine seconds after being told the officer would probably die and eighty-two seconds after being told that he had shot a police officer, Al-Khammasi begins crying and says, “[C]ome on brother. I’m sorry. I swear to God . . . please tell me.” ¶ 54 Al-Khammasi filed a notice of intent to introduce his statements from his conversation with Sergeant McLain. Al-Khammasi argued that these statements were relevant because they (1) “put into context the several statements that the State has introduced” and “not allowing that information would skew the evidence in this case and intentionally mislead the jury about how [Al-Khammasi] knows anything about the incident”; (2) “show [Al-Khammasi’s] state of mind when he heard the news that the person he shot was a police officer,” preventing the jury from being “intentionally” misled; and (3) rebut the inference created by statements introduced by the People that “he intentionally tried to kill [Officer C.D].” In his notice of intent, Al-Khammasi argued that these statements, though self-serving hearsay, were admissible under four hearsay exceptions: attacking and supporting credibility of declarant (CRE 806), excited utterance (CRE 803(2)), then 
27 existing mental, emotional, or physical condition (CRE 803(3)), and the residual exception (CRE 807). ¶ 55 Before Sergeant McLain’s testimony, the trial court heard the parties’ arguments regarding the admissibility of Al-Khammasi’s statements to Sergeant McLain. The People argued that (1) the statements should be excluded as self-serving hearsay; (2) the time delay between the shooting and the statements precluded the statements from falling under the “state of mind” (then existing mental, emotional, and physical condition) exception to hearsay; and (3) the excited utterance exception didn’t apply because Al-Khammasi’s statements were in response to questions, and the startling event was the shooting, not being told that he had shot a police officer. Defense counsel argued that the startling event was Al-Khammasi being told that he had shot a police officer. ¶ 56 After argument on the issue, the trial court excluded Al-Khammasi’s statements, ruling as follows: The Court is not going to permit those statements. They are self-serving hearsay. The Court finds there is no guarantee of trustworthiness; that they don’t fit into the exception of excited utterance or state of mind exception. Further, at this point [d]efense can’t advise the Court whether or not Mr. 
28 Al[-]Khammasi was under the influence of any anesthesia or pain medication when those statements were made. If he was under those medications, that clearly would cut against any trustworthiness at that point in time, but even taking that argument aside, the Court finds those are all self-serving hearsay, so I would deny that request. They don’t fit under the exceptions. They weren’t made right after the startling event. And the Court doesn’t find being told by a police officer that’s questioning you to be a startling event or would qualify as a startling event. 2. The Trial Court Didn’t Abuse its Discretion by Excluding the Statements ¶ 57 Although the trial court erred by excluding Al-Khammasi’s statements on the basis that they were self-serving hearsay, because the trial court didn’t abuse its discretion by finding that the exceptions invoked by Al-Khammasi didn’t apply, the trial court didn’t abuse its discretion by excluding the statement. ¶ 58 “We review a trial court’s evidentiary rulings for an abuse of discretion.” People v. Abdulla, 2020 COA 109M, ¶ 61. “A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law.” Id. ¶ 59 When an issue is preserved, we apply the nonconstitutional harmless error standard to a trial court’s evidentiary rulings. 
29 People v. Martinez, 2020 COA 141, ¶ 27; see also Hagos, ¶¶ 9, 12. Under this standard, “reversal is warranted if the error affects the substantial rights of the parties, meaning ‘the error substantially influenced the verdict or affected the fairness of the trial proceedings.’” Martinez, ¶ 28 (quoting Zapata v. People, 2018 CO 82, ¶ 61) (citation omitted). If, however, counsel fails to preserve an issue, we review for plain error. Hagos, ¶ 14. ¶ 60 We first address the trial court’s ruling that Al-Khammasi’s statements weren’t admissible because they were self-serving hearsay. To the extent that the trial court relied on the self-serving nature of the statements to exclude them, the trial court erred. ¶ 61 Hearsay is an out-of-court statement “offered in evidence to prove the truth of the matter asserted.” CRE 801(c). Unless it falls under an exception within the Colorado Rules of Evidence or is permitted by statute or procedural rules, hearsay is inadmissible. CRE 802. “Colorado law has no per se rule excluding a defendant’s self-serving hearsay statement.” People v. Vanderpauye, 2023 CO 42, ¶ 28. Rather, “a defendant’s self-serving hearsay statement may be admissible if it satisfies a hearsay-rule exception in the Colorado Rules of Evidence.” Id. 
30 ¶ 62 Thus, the trial court erred by excluding Al-Khammasi’s hearsay statements on the grounds that they were self-serving. But the trial court didn’t rely exclusively on the self-serving nature of the hearsay statements to determine their admissibility. In its ruling, the trial court also addressed why the statements failed to meet certain hearsay exceptions. This is where we turn next. ¶ 63 Al-Khammasi contends that the trial court improperly excluded his hearsay statements because they were admissible under three exceptions to the rule against hearsay: (1) the excited utterance exception; (2) the then existing mental, emotional, or physical condition exception; and (3) the residual exception. We address each exception in turn. a. The Excited Utterance Exception to the Rule Against Hearsay ¶ 64 Al-Khammasi contends that his statements are admissible as an excited utterance. An excited utterance is “[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” CRE 803(2). ¶ 65 A statement is admissible as an excited utterance if the statement’s proponent establishes that 
31 (1) the event was sufficiently startling to render normal reflective thought processes of the observer inoperative; (2) the statement was a spontaneous reaction to the event; and (3) direct or circumstantial evidence exists to allow the jury to infer that the declarant had the opportunity to observe the startling event. Vanderpauye, ¶ 42 (quoting People v. Pernell, 2014 COA 157, ¶ 31). ¶ 66 When determining whether an out-of-court statement was spontaneous, courts consider the lapse of time between the startling event or condition and the . . . statement; whether the statement was a response to an inquiry; whether the statement is accompanied by outward signs of excitement or emotional distress; and the declarant’s choice of words to describe the startling event or condition. Id. at ¶ 45 (quoting Compan v. People, 121 P.3d 876, 882 (Colo. 2005)). Whether an event was startling enough to render a defendant’s “normal reflective thought processes” inoperative may be “consider[ed] . . . in concert with” the question of spontaneity. Id. ¶ 67 When ruling on Al-Khammasi’s request to admit the statements, the trial court observed that the statements “weren’t made right after the startling event” and found that being told that you shot an officer while the police are questioning you isn’t a 
32 startling event. Based on the circumstances, this determination wasn’t an abuse of discretion. ¶ 68 Relying on Vanderpauye, Al-Khammasi argues that Sergeant McLain telling him that he shot a police officer was a startling event. In Vanderpauye, ¶ 44, our supreme court concluded that it was a startling event when the victim “suddenly woke up and accused [the defendant] of raping her.” The court noted that, at trial, the victim testified that the defendant “seemed ‘very startled’” when she accused him. Id. ¶ 69 But the facts surrounding Al-Khammasi’s statement are readily distinguishable from Vanderpauye. First, the statements were made during the course of an ongoing conversation with a police officer who was questioning him. Second, the delay between being told he shot a police officer and his denial was approximately twenty-eight seconds. We acknowledge that this isn’t a lot of time, but also note that it isn’t immediate, as the defendant’s reaction in Vanderpauye was. Third, Al-Khammasi didn’t sound upset until approximately forty-seven seconds after he was told he shot a police officer and approximately four seconds after he was told the officer was “probably going to die,” and he didn’t start crying until 
33 approximately eighty-two seconds after Sergeant McLain told him he shot a police officer and approximately thirty-nine seconds after Sergeant McLain told him the officer was “probably” going to die. It isn’t an abuse of discretion to conclude that this delay, although small, excluded the possibility that the reaction was spontaneous and that his thought processes were rendered inoperative. ¶ 70 Because the trial court didn’t rule in an arbitrary or unreasonable manner, it didn’t abuse its discretion by concluding that Al-Khammasi’s statements didn’t fall under the excited utterance exception. b. The Then Existing Mental, Emotional, or Physical Condition Exception to the Rule Against Hearsay ¶ 71 Another exception to the rule against hearsay Al-Khammasi invokes is CRE 803(3), which provides for the admission of “[a] statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health).” This exception, however, doesn’t encompass statements “of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant’s will.” 
34 CRE 803(3). For a statement to fall under the CRE 803(3) exception, “the statement must describe the declarant’s mental or emotional condition at the time the statement was made.” People v. Manyik, 2016 COA 42, ¶ 87 (quoting People v. Haymaker, 716 P.2d 110, 113 n.3 (Colo. 1986)). ¶ 72 The trial court didn’t abuse its discretion by finding that Al-Khammasi’s statements don’t fit under this exception because they are simply a memory or belief that he didn’t shoot a police officer, not statements describing his mental or emotional condition at the time he stated that he “never shot a cop” and “love[s] cops.” c. The Residual Exception to the Rule Against Hearsay ¶ 73 If a statement isn’t admissible under any specific exception, a court may admit it if it determines that it’s admissible under CRE 807, the residual exception. CRE 807 provides that [a] statement not specifically covered by [CRE] 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of 
35 justice will best be served by admission of the statement into evidence. ¶ 74 The trial court rejected that Al-Khammasi’s statements possessed the guarantees of trustworthiness required for admission under this exception. In determining whether a statement is trustworthy, courts look to the “nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made.” People v. McFee, 2016 COA 97, ¶ 19. Statements have been deemed trustworthy for CRE 807 purposes when they were spontaneously made to close friends or relatives, id. at ¶¶ 20-21, and when they were “not motivated by a police investigation,” People v. Lujan, 2018 COA 95, ¶ 27, rev’d on other grounds, 2020 CO 26. ¶ 75 In this case, the trial court didn’t abuse its discretion by finding that Al-Khammasi’s statements weren’t sufficiently trustworthy because they were made (1) to a police officer who was questioning him; (2) in response to the officer accusing him of a crime; and (3) where he had a motivation to deny the officer’s allegations. Given these circumstances, the trial court didn’t abuse 
36 its discretion by concluding that Al-Khammasi’s statements didn’t have “circumstantial guarantees of trustworthiness,” as required by CRE 807. ¶ 76 Accordingly, the trial court didn’t abuse its discretion by ruling that Al-Khammasi’s statements didn’t fall under any of the hearsay exceptions that he advanced. D. The Trial Court’s Admission of Evidence Without a Spoto Analysis and Without a Limiting Instruction ¶ 77 Al-Khammasi next contends that the trial court erred by admitting CRE 404(b) evidence without conducting the required Spoto analysis and without giving a limiting instruction to the jury. Specifically, Al-Khammasi contends that the trial court erred by admitting (1) evidence that he “smirk[ed]” and “laughed” at police officers in the hours after the shooting; (2) threatening statements he made to Deputy Todd Hauck five days after the shooting while still hospitalized; and (3) statements he made during recorded visits once he was at the county jail. ¶ 78 We aren’t persuaded that the trial court reversibly erred. 
37 1. Standard of Review and Legal Principles ¶ 79 Again, our review of a trial court’s evidentiary rulings, including whether to admit other acts evidence, is for an abuse of discretion. Yusem v. People, 210 P.3d 458, 463 (Colo. 2009); Abdulla, ¶ 61. “A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law.” People v. Garcia, 2021 COA 65, ¶ 45. We apply the nonconstitutional harmless error standard to preserved issues concerning a trial court’s evidentiary rulings. Martinez, ¶ 27; see also Hagos, ¶ 12. Issues that are unpreserved are reviewed for plain error. Hagos, ¶ 14. ¶ 80 CRE 404(b)(1) prohibits admission of “[e]vidence of any other crime, wrong, or act . . . to prove a person’s character in order to show that on a particular occasion the person acted in conformity with the character.” But this type of evidence “may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.” CRE 404(b)(2). ¶ 81 CRE 404(b) only governs admissibility “when the trial court determines that uncharged misconduct evidence supports an 
38 improper inference of the defendant’s character.” Rojas v. People, 2022 CO 8, ¶ 43. Further, a defendant’s acts fall within CRE 404(b)’s reach only if they are extrinsic; “intrinsic acts fall[] outside the Rule’s scope.” Id. at ¶ 44. An act is intrinsic if it “(1) . . . directly prove[s] the charged offense or (2) . . . occurred contemporaneously with the charged offense and facilitated the commission of it.” Id. at ¶ 52. Evidence of intrinsic acts “are exempt from [CRE] 404(b) because they are not ‘other’ crimes, wrongs, or acts.” Id. If evidence is intrinsic, the trial court should still “evaluate [its] admissibility . . . under [CRE] 401-403.” Id. If an act is extrinsic and “suggests bad character” then admissibility is governed by CRE 404(b), and the trial court must conduct a Spoto analysis. Id. If, however, “extrinsic evidence does not suggest bad character, [CRE] 404(b) does not apply, and admissibility is governed by [CRE] 401-403.” Id. at ¶ 52. ¶ 82 With these principles in mind, we turn to the challenged evidence. 2. Challenged Evidence ¶ 83 At trial, the People introduced multiple statements or acts by Al-Khammasi that occurred after the shooting. We analyze each 
39 challenged statement or act below in the order in which they occurred. a. Evidence that Al-Khammasi Laughed and Smirked at Officers ¶ 84 We begin by addressing Officer Katherine McFerran’s testimony that Al-Khammasi laughed and smirked at officers while in the hospital. i. Additional Facts ¶ 85 At trial, Officer McFerran testified to an encounter with Al-Khammasi that occurred in the hours following the shooting. During her testimony, the People asked her to describe what happened at the hospital, which drew an immediate objection from defense counsel. The trial court held a bench conference at which defense counsel stated, [I]t’s my understanding that this witness is going to testify that Mr. Al[-]Khammasi laughed at her. We object to that testimony under Rule 401 because it is not relevant. Under Rule 403 because it is more prejudicial than probative. It’s also speculative and invites the jury to guess as to what the meaning of it was. Furthermore, it appeals to the passions of the jury. Any negative connotation would appeal to the passion of the sympathies to the jury 
40 especially in light of the fact that it’s not relevant to anything. ¶ 86 Defense counsel also informed the court that the incident didn’t happen until approximately nine hours after the shooting. The People argued that the evidence was relevant to Al-Khammasi’s state of mind. The trial court overruled the objection, ruling that it “goes to state of mind.” ¶ 87 Officer McFerran then testified that at the hospital “[t]here [were] a lot of officers in uniform and out of uniform waiting” when Al-Khammasi was “wheeled out in a wheelchair. And as he was wheeled out through the hallway through [the officers] he kind of smirked and laughed as he was wheeled past.” ii. Analysis ¶ 88 Although the objection at trial was to relevance and unfair prejudice, on appeal Al-Khammasi contends that the court “abused its discretion by not deciding admissibility under Spoto and [CRE] 404(b).” It isn’t clear that Al-Khammasi’s objection at trial preserved the contention he advances on appeal. Moreover, we have trouble discerning how Al-Khammasi laughing and smirking at police officers constitutes other acts evidence subject to CRE 
41 404(b). But even assuming the trial court erred by admitting this evidence, any error was harmless and doesn’t merit reversal. ¶ 89 We reach this conclusion for two reasons. First, the challenged evidence was cumulative of properly admitted evidence that Al-Khammasi bore animosity toward police officers. For example, in video from Officer Daniel Patterson’s body-worn camera that was admitted at trial, Al-Khammasi is being treated in the emergency room and says, “I hate police” and appears to curse at police officers. Patterson later testified that the “gist” of Al-Khammasi’s statements were “that he didn’t care about the police.” Al-Khammasi doesn’t challenge the admission of any of this evidence on appeal. ¶ 90 Second, defense counsel’s thorough cross-examination of Officer McFerran renders any error in the admission of this evidence harmless. During cross-examination, defense counsel asked Officer McFerran about her emotional state at the hospital, her friendship with Officer C.D., whether she was aware of Al-Khammasi’s condition or treatment at the time, and why she didn’t write in her report or even discuss for over a year that Al-Khammasi had “smirked and laughed” at officers. This robust 
42 cross-examination substantially mitigated any unfair prejudice that could have resulted, assuming without deciding that the court erred. b. Al-Khammasi’s Statements to Deputy Hauck ¶ 91 Next we turn to Al-Khammasi’s contention that the trial court erred by admitting threatening statements he made to Deputy Hauck several days after the shooting while still hospitalized. i. Additional Facts ¶ 92 Approximately five days after the shooting, Al-Khammasi remained in the hospital, guarded by an officer at all times. While Deputy Hauck was on guard duty, Al-Khammasi was granted permission to shower. Deputy Hauck walked him down the hall toward the shower in arm and leg restraints. Al-Khammasi asked Deputy Hauck if he was going to remove the restraints for the shower, and Deputy Hauck responded that he couldn’t remove the restraints. Al-Khammasi then began “cussing” at him, so Deputy Hauck returned Al-Khammasi to his room. Upon returning to his room, Al-Khammasi said to Deputy Hauck, “I shoot pussy bitch cops like you. That’s what I do. And I’ve got a good lawyer, and when I get out, I’m gonna find you and kill you.” 
43 ¶ 93 Al-Khammasi objected to the introduction of this statement in a pretrial motion on the grounds that it “is not relevant under [CRE] 401”; he renewed this objection at trial. In response to his pretrial motion, the court ruled that the “statement[] may be relevant and may evidence the defendant’s state of mind. [It] may also be res gestae.” The court deferred its ruling on the admissibility of the statement until trial. Before Deputy Hauck testified, the court again addressed Al-Khammasi’s motion and ruled that the statement at issue, and other statements, were admissions of a party opponent and indicative of state of mind. The court also acknowledged its previous ruling that the statements “fell within the ambit of res gestae.” The court then permitted the People to introduce Al-Khammasi’s statement to Deputy Hauck. ii. Analysis ¶ 94 On appeal, Al-Khammasi again contends that the trial court erred by admitting his statement to Deputy Hauck without conducting a Spoto analysis and without giving a CRE 404(b) 
44 limiting instruction.
3 Because we conclude that a portion of Al-Khammasi’s statement is beyond the reach of CRE 404(b), we divide our analysis into two parts: (1) “I shoot pussy bitch cops like you. That’s what I do.”; and (2) “And I’ve got a good lawyer, and when I get out, I’m gonna find you and kill you.” (1) The First Part of Al-Khammasi’s Statement ¶ 95 The first part of Al-Khammasi’s statement — “I shoot pussy bitch cops like you. That’s what I do.” — isn’t “other” acts evidence subject to CRE 404(b). There was no evidence or argument in this case that Al-Khammasi shot at police on other occasions. The only occasion on which he is alleged to have done so is the charged offense. Thus, his statement isn’t evidence of an “other” act, but an admission of having engaged in the charged conduct. As the trial court recognized, it’s an admission of a party opponent. See CRE 3 To the extent the court invoked the res gestae doctrine as a basis for admitting the statement, we now understand that was error. See Rojas v. People, 2022 CO 8, ¶¶ 4, 41 (abolishing the res gestae doctrine in criminal cases). But that isn’t a basis for reversal for two reasons: (1) the trial court’s error in invoking res gestae wasn’t obvious at the time of trial, as Rojas was decided more than a year after trial, see People v. Crabtree, 2024 CO 40M, ¶ 6; and (2) as set forth below, the challenged evidence either isn’t CRE 404(b) evidence or its admission was harmless. 
45 801(d)(2)(A). Accordingly, it wasn’t error for the court to admit this portion of the statement without first performing a Spoto analysis or providing a limiting instruction. See Rojas, ¶ 43 (“If evidence doesn’t implicate the defendant’s character, Rule 404(b) doesn’t govern its admissibility.”). (2) The Remainder of Al-Khammasi’s Statement ¶ 96 Al-Khammasi then said, “And I’ve got a good lawyer, and when I get out, I’m gonna find you and kill you.” In contrast to the first portion of the statement, the latter portion of the statement may constitute an “other act” subject to CRE 404(b). And if it is other acts evidence, the evidence is extrinsic because it was a threat made toward Deputy Hauck without any direct connection to the charged offense involving Officer C.D. and because Al-Khammasi’s threat didn’t “directly prove the offense” and didn’t occur contemporaneously with the charged offense. See Rojas, ¶¶ 44, 52. Thus, a Spoto analysis was required for admission. See Rojas, ¶ 52. But even assuming that the trial court erred by allowing the People to introduce Al-Khammasi’s threatening statement to Deputy Hauck, any error was harmless for three reasons. 
46 ¶ 97 First, the sting of Al-Khammasi’s statement — arguably a confession to having shot a police officer, as charged — comes from the first part of the statement, which, as discussed above, was properly admitted. The latter portion of the statement isn’t similarly inculpatory. ¶ 98 Second, to the extent that the latter portion of the statement evinces hostility toward law enforcement, this evidence was cumulative of other unchallenged evidence the People introduced at trial. As discussed in Part II.D.2.a.ii above, there was substantial evidence of Al-Khammasi expressing animus toward law enforcement officers involved in the case. ¶ 99 Third, the latter portion of the statement provides potentially mitigating context to the first part of his statement. Without the latter portion of the statement, the first part — “I shoot pussy bitch cops like you. That’s what I do.” — appears to be an unadorned confession to the charged act. But the latter portion of the statement — the threatening portion of the statement — supports an alternate inference — namely, that the first two sentences of Al-Khammasi’s statement weren’t a confession, but simply an expression of bravado as part of an angry, albeit threatening, 
47 outburst. While not flattering, understood in this context it’s something other than a confession to the charged conduct. In any event, what weight, if any, to give to the properly admitted portion of the statement is entirely in the province of the jury; and the later part of the statement provides potentially important context in performing that function. Cf. People v. Short, 2018 COA 47, ¶ 46 (discussing that the purpose of the rule of completeness is “to qualify, explain, or place into context the evidence proffered by the prosecution”). ¶ 100 In summary, any error in admitting the latter portion of Al-Khammasi’s statement to Deputy Hauck without performing a Spoto analysis or giving a limiting instruction was harmless. c. Al-Khammasi’s Statements During Recorded Jail Visits ¶ 101 Finally, we address the statements Al-Khammasi made and the conduct he engaged in during two recorded jail visits. i. Additional Facts ¶ 102 After being released from the hospital, Al-Khammasi was detained at the county jail. While at the county jail, a friend visited Al-Khammasi on two occasions. One visit occurred ten days after 
48 the shooting, and the second occurred seventeen days after the shooting. These visits were audio- and video-recorded. ¶ 103 At trial, the People introduced two clips of the recorded visits without objection from Al-Khammasi. During one of the videos, his friend asks, “What is wrong with you?” Al-Khammasi responds, “[I]t’s like two in the morning, police he stopped me in the street, I’m walking, I don’t know what the fuck [inaudible] motherfucker police” and “this motherfucker he still survived, the police. He not die,” followed by laughter. In the second clip Al-Khammasi laughs when his friend tells him that Officer C.D. is still alive. ii. Analysis ¶ 104 Because Al-Khammasi didn’t object to the admission of this evidence, we review his contention that the court erred by failing to conduct a Spoto analysis or give a limiting instruction for plain error. Hagos, ¶ 14. Plain error addresses error that is both “obvious and substantial,” and the standard is “calculated to temper the contemporaneous-objection requirement in the interests of permitting an appellate court to correct particularly egregious errors.” Id. at ¶ 18 (first quoting Miller, 113 P.3d at 750; and then 
49 quoting Wilson v. People, 743 P.2d 415, 420 (Colo.1987)). We discern no error, much less plain error. ¶ 105 Al-Khammasi’s statements and laughter about the shooting don’t qualify as CRE 404(b) evidence, at least not obviously so. Al-Khammasi’s statement that “it’s like two in the morning, police he stopped me in the street, I’m walking, I don’t know” isn’t an other act and doesn’t suggest that he possesses bad character. Rather, it’s his own description of the events surrounding the charged conduct. It’s admissible as an admission of a party opponent under CRE 801(d)(2)(A) and relevant to his assertion of self-defense. ¶ 106 Similarly, Al-Khammasi’s statements “what the fuck [inaudible] motherfucker police” and “this motherfucker he still survived, the police. He not die,” and any laughter about the shooting, although demonstrating an animosity toward police generally and Officer C.D. specifically, don’t obviously qualify as CRE 404(b) evidence. This evidence too is probative of Al-Khammasi’s assertion that he acted in self-defense. ¶ 107 Accordingly, the trial court didn’t plainly error by admitting the recordings from the jail visits. 
50 E. Al-Khammasi’s Request to Review Officer C.D.’s and Corporal Carter’s Internal Records ¶ 108 Before trial, Al-Khammasi subpoenaed the internal police files and records for Officer C.D. and Corporal Carter. After conducting an in camera review of the documents provided by the City of Colorado Springs, the court declined to release any documents, finding as follows: After such inspection, the Court finds that none of the documents are relevant to the case at bar, and would therefore not be admissible at trial. The Court also finds that none of the documents contain exculpatory evidence that would be probative at trial. Further, the Court did conduct the balancing test enunciated in Martinelli v. District Court, [199 Colo. 163, 170,] 612 P.2d 1083, 1088 (1980), and finds that since the documents are neither relevant, probative, nor exculpatory, and would not be admissible at trial, the privacy and confidentiality of these governmental records far outweighs defense being able to obtain and review such documents. ¶ 109 Al-Khammasi requests that we review the subpoenaed documents to determine whether the trial court erred by declining to disclose any of them to Al-Khammasi. After conducting our own in camera review, we conclude that the trial court properly denied disclosure of any files relating to either officer. 
51 1. Standard of Review and Legal Principles ¶ 110 “We review a trial court’s resolution of discovery issues for an abuse of discretion.” People in Interest of A.D.T., 232 P.3d 313, 316 (Colo. App. 2010). In criminal cases, “the prosecution must provide to the defense any evidence that is favorable to the accused and material to the guilt or punishment of the accused.” People v. Lowe, 2020 COA 116, ¶ 9. Additionally, “[a] defendant who is charged with assaulting a police officer is entitled to disclosure of the fact that complaints charging excessive use of force have been filed against the officer involved.” People v. Walker, 666 P.2d 113, 121-
22 (Colo. 1983). But police officers also “have a right to privacy in their personnel files.” Lowe, ¶ 11. When analyzing disclosure, the trial court must conduct an in camera review of “all complaints of brutality, excessive use of force, dishonesty or untruthfulness” based on the standards articulated in Martinelli. Walker, 666 P.2d at 122. Martinelli addresses both the government’s claim of official information privilege and an officer’s individual claim of a constitutional right to privacy or their “right to confidentiality.” 199 Colo. at 169-70, 173, 612 P.2d at 1088, 1091. 
52 ¶ 111 Regarding official information privilege, when determining “the extent to which the privilege applies to the materials sought to be discovered,” the trial court must, through its in camera review, conduct an ad hoc balancing of “(a) the discoverant’s interests in disclosure of the materials; and (b) the government’s interests in their confidentiality.” Id. at 170, 612 P.2d at 1088-89. Factors that the trial court should consider when balancing these interests for police misconduct claims include (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff’s suit is nonfrivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff’s case. 
53 Id. at 171, 612 P.2d at 1089 (quoting Frankenhauser v. Rizzo, 59 F.R.D. 339, 344 (E.D. Pa. 1973)). ¶ 112 Regarding a police officer’s right to confidentiality, the court in Martinelli laid out a different balancing test that the trial court must perform to determine whether certain information must be disclosed. Id. at 174, 612 P.2d at 1091. The test requires that the trial court balance the following inquiries: (1) does the party seeking to come within the protection of right to confidentiality have a legitimate expectation that the materials or information will not be disclosed? (2) is disclosure nonetheless required to serve a compelling state interest? (3) if so, will the necessary disclosure occur in that manner which is least intrusive with respect to the right to confidentiality? Id. ¶ 113 Before a court engages in a Martinelli analysis, the defendant must demonstrate the following when a subpoena duces tecum is challenged: (1) A reasonable likelihood that the subpoenaed materials exist, by setting forth a specific factual basis; (2) That the materials are evidentiary and relevant; 
54 (3) That the materials are not otherwise procurable reasonably in advance of trial by the exercise of due diligence; (4) That the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (5) That the application is made in good faith and is not intended as a general fishing expedition. People v. Spykstra, 234 P.3d 662, 669 (Colo. 2010) (footnote omitted). ¶ 114 Additionally, when subpoenas are issued for materials protected by a “privilege or a right to confidentiality . . . a balancing of interests” is required and a “defendant must make a greater showing of need and, in fact, might not gain access to otherwise material information depending on the nature of the interest against disclosure.” Id. at 670. If the defendant fails to make the required Spykstra showing, then the trial court may decline to conduct an in camera review. People v. Cline, 2022 COA 135, ¶ 26. ¶ 115 If a trial court’s disclosure determinations after an in camera review are properly appealed, we may conduct our own independent in camera review on appeal. See A.D.T., 232 P.3d at 319-20. 
55 2. Additional Facts ¶ 116 Al-Khammasi served a subpoena duces tecum on the Colorado Springs Police Department requesting production of [a]ny and all internal police files or records related to or regarding Officer [C.D.] . . . and Corporal Ronald Carter . . . including but not limited to, all use of force reports, all disciplinary records or complaints, and any accompanying interviews, findings, investigations, photos, and documents relating thereto pursuant to C.R.S. 24-72-303. ¶ 117 Al-Khammasi also filed a brief in support of this subpoena and requested that the trial court conduct an in camera review of Officer C.D.’s and Corporal Carter’s personnel records to determine whether any documents should be disclosed to Al-Khammasi. In this brief, Al-Khammasi primarily recited the law surrounding disclosure and gave generic reasons for why the documents should be disclosed. In response, the City of Colorado Springs and the People filed a joint motion to quash the subpoena, arguing that Al-Khammasi’s request was a “fishing expedition” and that he failed to make the required Spykstra showing. Despite the motion to quash, the People and the city attorney agreed to tender the files to the trial court for an in camera review. 
56 ¶ 118 After conducting an in camera review of the tendered files, the trial court issued an order declining to release any of the subpoenaed information. The trial court agreed that Al-Khammasi had failed to meet the Spykstra requirements but stated that out of “an abundance of caution,” it conducted a full in camera review and found that none of the documents in the officers’ files were relevant, probative, or exculpatory, and therefore, “the privacy and confidentiality of these governmental records far outweighs defense being able to obtain and review such documents.” 3. The Trial Court Didn’t Err ¶ 119 We have reviewed the subpoenaed documents, which were provided to us under seal as part of the record on appeal. We agree with the trial court that Al-Khammasi failed to make an initial Spykstra showing because he failed to (1) provide proof that there is a reasonable likelihood the information exists; (2) show relevancy and evidentiary value of the requested documents; (3) show that he couldn’t prepare for trial without the subpoenaed documents; and (4) demonstrate that the subpoena wasn’t a fishing expedition. Even if he had made the initial Spykstra showing, our independent review of Officer C.D.’s and Corporal Carter’s records confirms that 
57 the trial court didn’t err by declining to disclose any records to Al-Khammasi. Nothing in either Officer C.D.’s or Corporal Carter’s files is relevant or would provide evidence that is constitutionally required. The government and the officers’ interest in confidentiality therefore outweighs Al-Khammasi’s interest in disclosure. ¶ 120 Accordingly, the trial court didn’t err by declining to disclose any documents from Officer C.D.’s or Corporal Carter’s files. III. Disposition ¶ 121 We affirm the judgment. JUDGE YUN and JUDGE LUM concur.